T.C. Memo. 2016-193

UNITED STATES TAX COURT

MICHAEL SHAMROCK AND VICTORIA BIGG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28725-11.                    Filed October 20, 2016.

<u>Sheldon Drobny</u>, for petitioners.

<u>Michael T. Shelton</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  This case is before the Court on remand from the U.S.

Court of Appeals for the Seventh Circuit (Court of Appeals).  On November 17,

2014, the Court of Appeals issued a mandate in accordance with its order filed on

September 22, 2014, and its judgment filed on September 23, 2014.  In its order

**[*2]** and its judgment, the Court of Appeals vacated the Court's Order and Decision entered on January 27, 2014,[1] and remanded this case for further proceedings in accordance with that order and that judgment.

In its Order dated January 15, 2015 (January 15, 2015 Order), the Court set this case for an evidentiary hearing at a special session that was to, and did, take place on March 30, 2015 (March 30, 2015 evidentiary hearing), in Chicago, Illinois (Chicago). In its Order dated January 20, 2015, the Court established a schedule for certain prehearing activity. Thereafter, there was extensive prehearing motion activity principally because of the questionable tactics that Sheldon Drobny (Mr. Drobny),[2] petitioners' representative in this case, decided to pursue.

---

[1]In its Order and Decision entered on January 27, 2014, the Court granted respondent's motion for entry of decision and entered a decision that reflected the stipulation of settled issues and the supplemental stipulation of settled issues which the parties had signed and which they had filed with the Court on February 28 and October 28, 2013, respectively (collectively sometimes, stipulations of settled issues).

[2]Mr. Drobny first entered an appearance in this case on December 17, 2013, the date on which respondent filed a motion for entry of decision reflecting the parties' stipulations of settled issues. See supra note 1. Mr. Drobny is not an attorney. He was admitted to practice before the Court on March 26, 1993, pursuant to the Court's Rules of Practice and Procedure then, but no longer, in effect that governed the admission of nonattorneys to practice before the Court. See sec. 7452 ("No qualified person shall be denied admission to practice before the Tax Court because of his failure to be a member of any profession or calling.")

**[\*3]** As stated in the Court's January 15, 2015 Order, the March 30, 2015 evidentiary hearing was set for the purpose of giving the parties the opportunity to present evidence as to whether the parties' stipulations of settled issues should be set aside. On March 13, 2015, petitioners filed a second supplement to the prehearing memorandum that they had filed on January 21, 2015. In that second supplement, petitioners narrowed the scope of the hearing to whether only paragraph 22 of the parties' supplemental stipulation of settled issues should be set aside.[3]

The issues for decision are:

(1) Will the Court set aside paragraph 22 of the parties' supplemental stipulation of settled issues? The Court holds that it will not.

(2) Will the Court grant respondent's motion to impose sanctions under section 6673(a)(2)[4] on Mr. Drobny? The Court holds that it will not.

---

[3]Paragraph 22 of the parties' supplemental stipulation of settled issues pertains to a certain loss that petitioners claimed in this case as an affirmative issue for the taxable year 2009.

[4]All section references are to the Internal Revenue Code in effect at all relevant times. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

[*4]                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Illinois at the time they filed the petition.

Petitioner Michael Shamrock (Mr. Shamrock) filed a Federal individual income tax (tax) return (return) for his taxable year 2007 (2007 return), in which he claimed a filing status of married filing separately. Mr. Shamrock and petitioner Victoria Bigg (Ms. Bigg) jointly filed a tax return for each of their taxable years 2008 (2008 return) and 2009 (2009 return). (The Court will sometimes refer collectively to the 2007 return, the 2008 return, and the 2009 return as the returns in question.) John A. Hauter (Mr. Hauter), a certified public accountant (C.P.A.) and an attorney, had prepared each of the returns in question.

Early in 2011, the Internal Revenue Service (IRS) began an examination (IRS examination) of Mr. Shamrock's taxable year 2007 and Mr. Shamrock's and Ms. Bigg's taxable years 2008 and 2009. They authorized Mr. Hauter to represent them with respect to that examination. (The Court will sometimes refer to Mr. Hauter as petitioners' prior representative.) During the course of the IRS examination, Mr. Hauter provided the revenue agent that the IRS had assigned to conduct that examination (revenue agent) an amended return for Mr. Shamrock's and Ms. Bigg's taxable year 2009 (first amended 2009 return). Thereafter, Mr.

[*5] Hauter provided the IRS with a second amended return for that taxable year (second amended 2009 return).

In the second amended 2009 return, Mr. Shamrock and Ms. Bigg claimed for the first time in Form 4797, Sales of Business Property, a loss of $435,751 (claimed Elm Court loss) from the sale of certain real property at 1249 Elm Court (Elm Court), Glenview, Illinois (Elm Court property).[5]  Included as part of the second amended 2009 return was a worksheet that explained, inter alia, that "developer expenses" of $162,898 had been "TRANSFERRED TO FROM [sic] 4797".  Mr. Shamrock and Ms. Bigg had originally claimed "developer expenses" of $162,898 in Schedule C, Profit or Loss From Business (Schedule C), that they had included as part of their 2009 return and that related to what was described in that schedule as Ms. Bigg's "DENTAL PRACTICE & DEVELOPER".

Around early June 2011, Mr. Shamrock and Ms. Bigg wanted to terminate their relationship with Mr. Hauter because they were dissatisfied with the services that he had been providing them with respect to the IRS examination of taxable years 2007, 2008, and 2009.  One of Ms. Bigg's patients[6] recommended to Ms.

---

[5]Paragraph 22 of the supplemental stipulation of settled issues sets forth the agreement of the parties with respect to the claimed Elm Court loss.

[6]At all relevant times, Ms. Bigg was a dentist.

**[*6]** Bigg that she consider retaining her son, Grant Niehus (Mr. Niehus), who specialized in tax matters.

Mr. Niehus had been admitted to the bar of the Supreme Court of Illinois (Illinois State bar) on May 1, 1980, and was thereby authorized to practice law in that State. From the time he was admitted to the Illinois State bar to the time of the March 30, 2015 evidentiary hearing in this case, Mr. Niehus had never been disciplined or disbarred.[7] The Illinois State bar requires that its members periodically register with it, pay dues to it, and satisfy certain continuing legal education (CLE) requirements. (The Court will sometimes refer collectively to the requirements of the Illinois State bar that its members periodically register with it, pay dues to it, and satisfy certain CLE requirements as the Illinois State bar attorney status requirements.) In the event that a member of the Illinois State bar fails to

---

[7]The Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois showed in its Web site as of February 9, 2015, which was approximately a month and a half before the March 30, 2015 evidentiary hearing took place, that Mr. Niehus had no record of discipline by, or disciplinary proceedings pending before, that court. However, as discussed below, that Web site also showed that Mr. Niehus was not authorized to practice law in Illinois because after 2009 he had not registered annually and paid annual dues to the Illinois State bar; nor had he satisfied the Illinois State bar CLE requirements. See discussion infra of Ill. Sup. Ct. Rules 756 and 796 addressing the Illinois State bar attorney status requirements.

[*7] comply with any of the Illinois State bar attorney status requirements, that member will no longer be authorized to practice law in Illinois.

Ms. Bigg contacted Mr. Niehus after her patient had recommended him and arranged a meeting with him (first meeting or initial meeting) that took place in early June 2011. Mr. Shamrock and Ms. Bigg met with Mr. Niehus for about two hours during that first meeting. They explained to him that the IRS was examining taxable years 2007, 2008, and 2009 and that there were approximately 50 issues that the IRS had raised during that examination (IRS examination issues) and one affirmative issue (namely, the claimed Elm Court loss) that they had raised during that examination in their second amended 2009 return. (The Court will sometimes refer collectively to the IRS examination issues and the affirmative issue relating to the claimed Elm Court loss that Mr. Shamrock and Ms. Bigg raised in the second 2009 amended return as the examination issues.) Mr. Shamrock and Ms. Bigg also explained to Mr. Niehus during their initial meeting with him that they were dissatisfied with the individual who had been representing them before the IRS with respect to that examination. Mr. Shamrock and Ms. Bigg knew when they had their first meeting with Mr. Niehus that Mr. Niehus would be starting at a disadvantage if they were to retain him to represent them with respect to the IRS examination. In fact, during their initial meeting with Mr. Niehus, Mr. Shamrock

[*8] and Ms. Bigg characterized the then-current situation with respect to the IRS examination of the taxable years 2007, 2008, and 2009 as a "mess", an assessment with which Mr. Niehus agreed after he learned more about the IRS examination, the events that occurred during that examination, and how it had been handled by petitioners' prior representative.

Mr. Shamrock and Ms. Bigg knew before their initial meeting with Mr. Niehus that a resolution of the claimed Elm Court loss that was favorable to them depended in large part on how Mr. Shamrock intended to, and did, use the Elm Court property and on their tax basis in that property. Mr. Shamrock and Ms. Bigg also knew that establishing those factual matters in turn depended on the willingness of the IRS to accept what they contended were the salient facts about those matters. Mr. Shamrock and Ms. Bigg understood before they had their first meeting with Mr. Niehus that convincing the IRS to accept what they contended were the salient facts with respect to the claimed Elm Court loss would be difficult for them and for anyone, such as Mr. Niehus, whom they decided to retain to represent them. That was because Mr. Shamrock and Ms. Bigg knew before that initial meeting took place that, as a result of certain events that had occurred during the IRS examination, certain representatives of the IRS who were involved in that examination already had grown suspicious of, and had trust and credibility

**[*9]** issues with, them and their claims regarding at least some of the examination issues. As a result, Mr. Shamrock and Ms. Bigg understood fully when they retained Mr. Niehus at their first meeting with him in early June 2011 that Mr. Niehus was being placed in the difficult situation of persuading the IRS to trust and accept what Mr. Shamrock and Ms. Bigg maintained were the salient facts regarding the claimed Elm Court loss, in the face of and despite the trust and credibility issues that certain IRS representatives already had with them as of the time of that meeting.

Mr. Niehus asked Mr. Shamrock and Ms. Bigg a lot of questions during their initial meeting about the examination issues. Mr. Niehus' numerous questions regarding those issues during their first meeting caused Ms. Bigg to comment to Mr. Niehus that Mr. Shamrock and she had not previously been asked any questions about the examination issues.

Toward the conclusion of the initial meeting with Mr. Shamrock and Ms. Bigg, Mr. Niehus advised them that they and he, as their representative, needed to address with the IRS the examination issues with a goal of resolving all of them and avoiding litigating any of them. Mr. Niehus made it clear to Mr. Shamrock and Ms. Bigg that although he was willing to represent them in attempting to resolve with the IRS all of the examination issues for taxable years 2007, 2008,

[*10] and 2009, he was unwilling to represent them in the event that they and the IRS were unable to reach a mutually satisfactory resolution of all of those examination issues and they wanted to litigate the unresolved issues. That was because, as he told Mr. Shamrock and Ms. Bigg at their first meeting, he was not a trial lawyer. However, Mr. Niehus indicated to them that in the event that they wanted a trial with respect to any unresolved examination issues, he would recommend a trial lawyer to represent them.

Mr. Shamrock and Ms. Bigg retained Mr. Niehus at their initial meeting to represent them before the IRS with respect to taxable years 2007, 2008, and 2009. During his representation of Mr. Shamrock and Ms. Bigg from early June 2011 until December 2013, Mr. Niehus provided to them competent, valuable, diligent, and effective assistance in (1) advancing arguments to certain IRS representatives explaining how and why the documents that Mr. Shamrock and Ms. Bigg provided to the IRS and the applicable tax law supported each of their positions with respect to each of the examination issues for each of the taxable years 2007, 2008, and 2009, including the claimed Elm Court loss that they had raised in their second amended 2009 return, and (2) advocating acceptance by those IRS representatives of each of those positions. During that representation which ended in December 2013, petitioners never asked Mr. Niehus to recommend a trial lawyer to them.

**[*11]** In order to authorize the IRS to deal with Mr. Niehus and to stop dealing with petitioners' prior representative with respect to the examination issues for taxable years 2007, 2008, and 2009, on June 17, 2011, Mr. Shamrock and Ms. Bigg submitted to the IRS Form 2848, Power of Attorney and Declaration of Representative (Form 2848). In Part I, Power of Attorney, of Form 2848, which Mr. Shamrock and Ms. Bigg signed on June 1, 2011, they authorized Mr. Niehus to represent them before the IRS with respect to tax matters for taxable years 2007, 2008, and 2009. In Part II, Declaration of Representative, of Form 2848, which Mr. Niehus signed on the same date, he represented that he was a member in good standing of the Illinois State bar.[8] Although Mr. Niehus did not intend to misstate his status with the Illinois State bar or to deceive the IRS or petitioners when he signed part II of Form 2848, his representation in that part that he was a member in good standing of the Illinois State bar was not accurate. Mr. Niehus simply did not have in mind, and may not even have been aware, when he signed part II of Form 2848 that after 2009 he no longer was authorized to practice law in the State of Illinois on account of his failure to comply with certain Illinois State bar attorney status requirements. That was because Mr. Niehus had been under

_____

[8]Mr. Niehus did not represent in part II of Form 2848 or at any other time that he was a certified public accountant, an enrolled agent, or any other category of representative authorized to practice before the IRS that was listed in that part.

[*12] intense pressures and stresses for a number of years both before and after 2009 that were attributable to the critical illness of his spouse and her death in February 2008 from that illness as well as his dealing for over three years after her death with resolving the problems associated with a franchise business that his spouse and he had operated.

In furtherance of the goal (discussed above) that Mr. Niehus recommended to Mr. Shamrock and Ms. Bigg during their initial meeting of settling all, and litigating none, of the examination issues for each of the taxable years 2007, 2008, and 2009, Mr. Niehus performed as part of his representation of them before the IRS, inter alia, the following services, some of which the Court will discuss in more detail below. Mr. Niehus assisted Mr. Shamrock and Ms. Bigg in identifying, locating, and gathering the documents that they needed to present to the IRS in order to substantiate the position that they had taken with respect each of the examination issues for each of those years, including the claimed Elm Court loss that they had raised in their second amended 2009 return. Mr. Niehus also prepared and sent letters to the IRS in which he advanced arguments explaining how and why the documents that Mr. Shamrock and Ms. Bigg provided to the IRS and the applicable tax law supported each of those positions and advocated acceptance of each of those positions. In addition, Mr. Niehus, accompanied by

[*13] Mr. Shamrock and Ms. Bigg, had a number of meetings with representatives of the Appeals Office of the IRS (Appeals Office) as well as with representatives of the Office of Chief Counsel of the IRS (Chief Counsel's office) that took place both before and after they filed the petition commencing this case. During those various meetings, Mr. Niehus continued to (1) advance arguments explaining how and why the documents that Mr. Shamrock and Ms. Bigg provided to the IRS and the applicable tax law supported each of their positions with respect to each of the examination issues for each of the taxable years 2007, 2008, and 2009, including the claimed Elm Court loss that they had raised in their second amended 2009 return, and (2) advocate acceptance of each of those positions. During those meetings, Mr. Niehus was proactive in protecting the interests of his clients, Mr. Shamrock and Ms. Bigg. To illustrate, during a meeting with a counsel for respondent that took place in February 2013 after Mr. Shamrock and Ms. Bigg had filed the petition and respondent had filed the answer in this case, Mr. Niehus successfully prevented Mr. Shamrock from saying something inculpatory in response to certain questions of that counsel with respect to matters that she had raised at that meeting but that were unrelated to and outside the scope of the examination issues for the taxable years 2007 through 2009.

**[\*14]** Although Mr. Niehus attempted during the several months after he was retained in June 2011 to resolve all of the examination issues, no resolution of those issues was reached. That was because many of the examination issues involved expenses that Mr. Shamrock and Ms. Bigg had claimed but were unable to substantiate with appropriate documentation. In addition, other examination issues involved unreported income that they were unable to refute. Nonetheless, before respondent issued the respective notices of deficiency for taxable years 2007, 2008, and 2009 on which this case is based, Mr. Shamrock and Ms. Bigg were not willing to concede those issues.

On November 7, 2011, respondent issued a notice of deficiency (notice) to Mr. Shamrock for the taxable year 2007 (2007 notice), a notice to Ms. Bigg and him for the taxable year 2008 (2008 notice), and a notice to them for the taxable year 2009 (2009 notice). The 2009 notice did not allow Mr. Shamrock and Ms. Bigg the claimed Elm Court loss that they had claimed for the first time in their second amended 2009 return.

After respondent issued the 2007 notice, the 2008 notice, and the 2009 notice, petitioners filed the petition and thereby commenced this case.[9] After

---

[9]Mr. Niehus did not sign the petition in this case. Nor did he submit an entry of appearance form in this case until, as discussed below, the Court ordered
(continued...)

[*15] respondent filed the answer, respondent's counsel referred the case to the Appeals Office for further settlement discussions. Mr. Shamrock and Ms. Bigg understood that Mr. Niehus intended to focus, and they wanted him to focus, his efforts during those settlement discussions on persuading the IRS to accept their position with respect to certain examination issues that were of particular and major importance to them because of the respective amounts involved, namely, the claimed Elm Court loss for the taxable year 2009 and another claimed loss from a certain partnership for petitioners' taxable year 2008 (claimed 2008 partnership loss).

On June 19, 2012, the Appeals officer whom the Appeals Office had assigned to petitioners' case sent petitioners a letter that referred to a telephone discussion that he had had with Mr. Shamrock on March 9, 2012, during which Mr. Shamrock had asked the Appeals officer to consider additional information that the revenue agent who conducted the IRS examination had not reviewed. In his letter, the Appeals officer asked petitioners to provide that additional information to him by July 9, 2012.

---

[9](...continued)
him to do so on October 28, 2013, when he first appeared before the Court on behalf of petitioners at the call of this case from the calendar for the Court's trial session in Chicago that commenced on that date.

[*16] On July 11, 2012, Mr. Niehus sent a letter and certain documents to the Appeals officer that related to certain examination issues other than the claimed Elm Court loss.

On August 29, 2012, the Appeals officer held a meeting with petitioners and Mr. Niehus. The revenue agent was also present at that meeting.

As far as the Appeals officer was concerned, not only was the nature (i.e., ordinary vs. capital) of the claimed Elm Court loss still in dispute, but the claimed tax basis of petitioners in the Elm Court property and thus the amount, if any, of the claimed Elm Court loss on the disposition of that property also were in dispute.

By facsimile (fax) dated November 20, 2012 (Mr. Niehus' November 20, 2012 fax), Mr. Niehus sent the Appeals officer a draft of a letter dated November 20, 2012 (draft November 20, 2012 letter) and certain documents that related to the claimed Elm Court loss. In Mr. Niehus' November 20, 2012 fax, he indicated that the enclosed letter was "a draft copy (preliminary) to the final letter forthcoming the week of Nov. 26, 2012." Mr. Niehus explained in that fax that the letter was a draft because "the final #'s are still being finalized, but #'s noted are close." In his draft November 20, 2012 letter, Mr. Niehus summarized what he believed were the pertinent facts relating to the claimed Elm Court loss. He also set forth in that letter relevant tax authority and analyzed why the application of that authority

[*17] to those facts supported petitioners' position that they are entitled to that claimed loss and advocated acceptance of that position. Included in the tax authority that Mr. Niehus discussed and analyzed in his draft November 20, 2012 letter was section 165(a), which he described in that draft letter as "[t]he starting point" in analyzing whether petitioners are entitled to the claimed Elm Court loss and which he quoted as follows: "[T]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise." Mr. Niehus then pointed out in his draft November 20, 2012 letter that "IRC [section] 165(c) limits the deduction for losses for individuals * * * to those who [sic] are: (1) incurred in a trade or business [or] (2) losses incurred in any transaction entered into [for] profit, though not connected with a trade or business." Thereafter in his draft November 20, 2012 letter, Mr. Niehus discussed and analyzed the relevant regulations promulgated under section 165(c) and certain caselaw decided under that section and applied those authorities to what Mr. Shamrock and Ms. Bigg had led him to believe were the pertinent facts relating to the claimed Elm Court loss, which he set forth in that letter. Mr. Niehus concluded his draft November 20, 2012 letter as follows: "The taxpayer[s] ha[ve] demonstrated by their actions and prior professional experience that they did convert a residence into a business venture which unfortunately did not result in a

[*18] profit for the taxpayers due to the extreme downturn in the real estate market in 2008 thru today. Thus their 2009 tax return should reflect a section 1231 loss in the amount of".[10]

By fax dated December 5, 2012, Mr. Niehus sent to the Appeals officer a letter dated December 6, 2012, and certain documents that related to the claimed Elm Court loss. In that letter, Mr. Niehus stated: "Please note that we have enclosed final numbers regarding the sale of 1249 Elm [Court] for Bigg[], Shamrock. Please review and advise if you need any additional information. My client and I are available to meet with you in person or by phone at your earliest convenience to resolve this [claimed Elm Court loss] matter."

By fax dated January 9, 2013, Mr. Niehus sent to the Appeals officer a letter and certain documents that related to certain examination issues other than the claimed Elm Court loss.

On January 16, 2013, the Appeals officer held a second meeting with petitioners and Mr. Niehus.

---

[10]Mr. Niehus did not provide the amount of the claimed Elm Court loss in Mr. Niehus' draft November 20, 2012 letter. That is because, as noted previously, Mr. Niehus had pointed out in Mr. Niehus' November 20, 2012 fax that the numbers "are still being finalized".

[*19] On January 25, 2013, Mr. Niehus sent to the Appeals officer a letter (January 25, 2013 letter) and certain documents that related to the claimed Elm Court loss. In that letter, Mr. Niehus stated in pertinent part: "[W]e would like to provide further documentation regarding the * * * property at 1249 Elm Court". In his January 25, 2013 letter, Mr. Niehus described the documents that he enclosed with that letter as follows:

- Detailed expenses totaling $168,312 which my clients spent on the 1249 Elm Court property.

- Several comparable real estate listings in reference to the property at 1249 Elm Court to establish property value.

- Letter from Kim Benjamin, Principal of The Lord Companies, LLC, dated January 23, 2013 to establish land/property value.

- Detailed Disbursement listing from bank.

Mr. Niehus closed his January 25, 2013 letter to the Appeals officer as follows: "Please review and advise if you need additional information. My client and I are available to meet with you in person or by phone at your earliest convenience to resolve this matter expeditiously."

By fax dated February 4, 2013, Mr. Niehus sent the Appeals officer a letter dated February 6, 2013, and certain documents that related to the claimed Elm Court loss. In that letter, Mr. Niehus stated in pertinent part: "Attached are copies

[*20] of checks from Libertyville Land Partners regarding the property at 1249 Elm Court in Glenview, Illinois. If possible, we would like to meet with you as soon as possible to reconcile [sic] this pending real estate issue. Please review and advise if you need any additional information."

At a time not established by the record, Mr. Niehus provided the Appeals officer with a written timeline of events relating to the claimed Elm Court loss.

At a time not established by the record around February 2013, the Appeals officer ultimately offered to settle the claimed Elm Court loss by allowing petitioners a loss of $50,000 with respect to the Elm Court property ($50,000 IRS Appeals Office settlement offer). That settlement offer amounted to a concession by respondent of only approximately 11 percent of the $435,751 loss that petitioners had claimed with respect to that property in their second amended 2009 return. Mr. Niehus informed the Appeals officer that he believed that petitioners had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss. The Appeals officer was unwilling to increase the $50,000 IRS Appeals Office settlement offer. Mr. Niehus advised petitioners to reject that offer, and they did.

By February 2013, the Appeals officer and Mr. Niehus had been able to reach a basis of settlement at the IRS Appeals Office as to each of the examination issues except the claimed Elm Court loss and the claimed 2008 partnership loss.

**[\*21]** Subsequently, the IRS Appeals Office returned the case to the Chief Counsel's office for trial preparation. That was because the Court had set this case for trial at its trial session in Chicago that was to commence on March 11, 2013 (March 11, 2013 Chicago trial session).

On February 13, 2013, counsel for respondent to whom the Chief Counsel's office had assigned this case calendared for trial at the Court's March 11, 2013 Chicago trial session (first counsel for respondent) held a so-called Branerton conference (Branerton conference)[11] with petitioners and Mr. Niehus. They agreed at that conference that the only issues in the case that remained in dispute were the claimed Elm Court loss and the claimed 2008 partnership loss. The parties discussed those two remaining issues at the Branerton conference.[12] In

---

[11]See Branerton Corp. v. Commissioner, 61 T.C. 691 (1974).

[12]Mr. Niehus also advanced arguments at the Branerton conference with the first counsel for respondent that petitioners should not be liable for the accuracy-related penalties under sec. 6662(a) that respondent had determined in the respective notices to impose for the taxable years 2007, 2008, and 2009. It is not clear from the record whether Mr. Niehus and petitioners had reached a final resolution with the IRS Appeals Office of the respective accuracy-related penalty issues for the taxable years 2007 and 2009 when they met with the first counsel for respondent on February 13, 2013. Regardless of whether they had, Mr. Niehus was still advocating for them that they should not be liable for those penalties. As discussed below, the stipulation of settled issues which petitioners and respondent signed, which resolved certain issues for only taxable years 2007 and 2009 (not for taxable year 2008), and which they filed with the Court on February 28, 2013,

(continued...)

[*22] those discussions, Mr. Niehus continued to advocate on petitioners' behalf, inter alia, that petitioners were entitled to ordinary loss treatment for the entire amount of the claimed Elm Court loss. He continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

Not only was the nature (i.e., ordinary vs. capital) of the claimed Elm Court loss still in dispute at the <u>Branerton</u> conference with the first counsel for respondent, but the claimed tax basis of petitioners in the Elm Court property and thus the amount, if any, of the claimed loss on the disposition of that property also were in dispute.

On February 22, 2013, the first counsel for respondent sent a letter to petitioners (February 22, 2013 letter), who were pro sese in this case, and sent a copy of that letter to Mr. Niehus. In that letter, the first counsel for respondent summarized the then status of the case in pertinent part as follows:

> You agreed that the only remaining issues in your case were 1) the
> Libertyville partnership losses claimed on your 2008 income tax

---

[12](...continued)
reflected their agreement that Mr. Shamrock is liable for the taxable year 2007 and that Ms. Bigg and he are liable for the taxable year 2009 for the accuracy-related penalty. None of the examination issues for petitioners' taxable year 2008 (i.e., the claimed 2008 partnership loss, certain claimed itemized deductions, and the accuracy-related penalty issue) was settled in that stipulation of settled issues.

**[\*23]** return[] [claimed 2008 partnership loss] and 2) whether, and/or to what extent you are entitled to claim a loss from the sale of the property located at 1249 Elm Court.[13] We also discussed that we would need additional documentation in order to resolve the remaining issues. Due to your case being on the [Court's] March 11, 2013 Trial Calendar, we agreed that it would be best to file a motion for continuance on your case in order to allow you additional time to provide the additional documentation.

Accordingly, I have prepared a stipulation of settled issues and joint motion for continuance of trial. The stipulation of settled issues reflects the issues that were agreed to at Appeals. Please sign in blue ink the original and three copies of the stipulation of settled issues and the joint motion for continuance of trial. * * *

On February 28, 2013, the parties filed with the Court a stipulation of settled issues (February 28, 2013 stipulation of settled issues) that petitioners, not Mr. Niehus,[14] and the first counsel for respondent on behalf of respondent had signed. That stipulation of settled issues resolved each of the examination issues for taxable years 2007 and 2009 except the claimed Elm Court loss and none of the examination issues for taxable year 2008, including the claimed 2008 partnership loss.

On March 11, 2013, the Court called this case from the calendar for its March 11, 2013 Chicago trial session. Pursuant to the parties' agreement set forth

---

[13]See supra note 12.

[14]See supra note 9.

[*24] in the first counsel for respondent's February 22, 2013 letter, the parties filed with the Court at that calendar call a joint motion for continuance of trial. The Court granted that motion.

At the end of May 2013, the Court set this case for trial at its trial session in Chicago that was to commence on October 28, 2013 (October 28, 2013 Chicago trial session). Sometime during the summer of 2013, Mr. Niehus and petitioners met (summer 2013 meeting) with the counsel for respondent to whom the Chief Counsel's office had assigned this case calendared for that trial session (second counsel for respondent).[15] At that meeting, Mr. Niehus discussed the two major issues that remained unresolved, namely, petitioners' claimed Elm Court loss and their claimed 2008 partnership loss.[16] Mr. Niehus advocated to that counsel that petitioners are entitled to the entire amount of each of those claimed losses. He continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

---

[15]The second counsel for respondent was not the first counsel for respondent.

[16]The accuracy-related penalty for the taxable year 2008 that respondent had determined in the notice for that year also remained at issue as well as an adjustment of under $1,000 relating to claimed itemized deductions for that year.

**[*25]** With respect to the claimed Elm Court loss, in addition to advocating to the second counsel for respondent that petitioners' basis in the Elm Court property was significantly less than the amount that they had received when they disposed of that property and that therefore petitioners had incurred a loss for tax purposes in the amount that they claimed in their second amended 2009 return, Mr. Niehus also advocated to that counsel during the summer 2013 meeting, as he had advocated when he was dealing with the IRS Appeals officer and the first counsel for respondent, that the claimed Elm Court loss was an ordinary, not a capital, loss. Mr. Niehus knew, and advised petitioners, that, given their tax situation for the taxable years 2007, 2008, and 2009 (and their anticipated tax situation thereafter),[17] a capital loss for taxable year 2009 with respect to the Elm Court property would have been of virtually no tax benefit to them. Mr. Niehus also advised petitioners that, even if the IRS were willing to concede the entire amount (i.e., $435,751) of the claimed Elm Court loss as a capital, not an ordinary, loss, any such concession, given petitioners' tax situation, would have been of virtually no tax benefit to them for the taxable year 2009 or for any other taxable year. That

_____

[17]Petitioners did not have capital gain for any of the years at issue (and did not anticipate having any substantial capital gain for subsequent taxable years) that would have been reduced by the claimed Elm Court loss if that loss had been treated as a capital loss.

[*26] was because, Mr. Niehus told petitioners, under the relevant tax law the maximum amount of capital loss (in excess of capital gain) that is allowable each year to an individual is $3,000. He also told them that, in contrast to that capital loss tax treatment, under the relevant tax law there is no similar limitation on the use of an ordinary loss to reduce ordinary income. Mr. Niehus further informed petitioners that consequently a concession by the IRS of an ordinary loss with respect to the Elm Court property in an amount that was significantly smaller than a capital loss for the entire amount of the loss that petitioners claimed in their second amended return with respect to that property would be significantly more beneficial for tax purposes to petitioners. In this regard, petitioners made concessions, as reflected in the stipulations of settled issues, of many IRS determinations that would have resulted in a substantial increase in their ordinary income for each of the taxable years 2007, 2008, and 2009. Mr. Niehus advised petitioners that if the IRS were to agree to allow an ordinary loss for taxable year 2009 with respect to the Elm Court property, even in an amount that was significantly less that the entire amount of the claimed Elm Court loss, any such ordinary loss, in contrast to treating the claimed Elm Court loss as a capital loss, would have benefited petitioners dollar for dollar in reducing the additional amount of ordinary income for each of those years that they would have as a result of those concessions.

[*27] At the conclusion of the summer 2013 meeting, the second counsel for respondent was very skeptical of petitioners' position that their claimed Elm Court loss was an ordinary loss, not a capital loss. In fact, that counsel offered to resolve the claimed Elm Court loss issue by allowing petitioners a capital loss with respect to the Elm Court property for the taxable year 2009.[18] Mr. Niehus rejected that offer on behalf of petitioners, and he proceeded to advocate again to the second counsel for respondent why the full amount of the claimed Elm Court loss should be allowed as an ordinary loss for petitioners' taxable year 2009. He also continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

The second counsel for respondent was skeptical not only of the ordinary nature of the claimed Elm Court loss but also of the basis that petitioners were claiming with respect to the Elm Court property and that they used in determining the amount of the loss that they had claimed with respect to that property in the second amended 2009 return. In an effort to address the concerns of the second counsel for respondent regarding the basis of petitioners in the Elm Court property, on August 22, 2013, Mr. Niehus sent to that counsel a letter and certain

---

[18]The record does not establish the amount of capital loss that the second counsel for respondent offered to allow petitioners in an effort to resolve the claimed Elm Court loss.

[*28] documents that related to the claimed Elm Court loss. In that letter, Mr.

Niehus stated in pertinent part:

> This letter is being sent to you to follow-up on the pending issues regarding the Bigg/Shamrock case for [sic] which you are handling. Attached are expense ledgers pertaining to the property at 1249 Elm Court in Glenview, Illinois. These ledgers and receipts [that] substantiate $140K of the $168K of expenses regarding the above property. The remaining $28K of expenses was expensed in other months and this documentation is forthcoming and will be mailed to you under separate cover. However, this documentation solidifies the majority of the $168K in expenses.
>
> We will also be forwarding you more documentation on these expenses that is forthcoming from the bank the [sic] further substantiates these expenditures.
>
> If possible, we would like to meet with you as soon as possible to reconcile this pending real estate issue.

In a continuing effort to address the concerns of the second counsel for

respondent regarding the basis of petitioners in the Elm Court property, by fax

dated September 23, 2013, Mr. Niehus sent to that counsel a letter dated September 20, 2013 (September 20, 2013 letter) and certain documents that related to the

claimed Elm Court loss. In that letter, Mr. Niehus stated in pertinent part:

> This letter is being sent to you to follow-up on the pending issues regarding the Bigg/Shamrock case for [sic] which you are handling. As my client has been attempting to gather all needed information you requested, there has been material changes in the proper calculation of the 1249 Elm [Court] tax basis.

**[*29]** Thus the correct basis is as follows:

1.)      Land does not change $468,500.

2.)      The original loan authorized was $781,221, per closing statement, Item "A". The Taxpayer wrote 3 checks $45,000, $40,000 and $30,000 totaling $115,000. Per attachment "C" final. The total amount invested is $897,221. Per Bank statement total is $895,779 with the difference being accrued interest.

3.)      The taxpayer's out of pocket was $168,000 but must be reduced by the $115,000 of checks written to Bank--thus total * * * out of pocket paid by taxpayer is $53,000.

4.)      Lastly, per the closing statement, "B" $200,000 was paid as a final draw to pay various subcontractors. These payments originated from the seller's funds at closing, and were the last payments to complete the project.

In summary, total Basis is calculated as follows:

| | |
|---|---|
| Land | $468,500 |
| Bank | $895,000 |
| Taxpayer Funds | $ 53,000 |
| Closing | $200,000 |
| **Total** | **$1,616,500** |

In his September 20, 2013 letter, Mr. Niehus further stated in pertinent part:

"I do know this may be confusing, therefore, the taxpayer and I can meet ASAP in

[*30] order to more easily track the flow of cash investments and **basis**. Also, enclosed is a history of Mr. Shamrock's real estate development projects over the last 20 plus years."

As is apparent from Mr. Niehus' September 20, 2013 letter, as late as the date of that letter, which was more than two years after petitioners had retained him, they were sending documents to him that they had not previously given him (new documents) or the IRS, some of which contradicted certain documents that they had previously given him (old documents) and the IRS. They wanted and expected Mr. Niehus to present those new documents that contradicted certain old documents (new and contradictory documents) to the second counsel for respondent and to continue to advance and advocate their position that they were entitled to ordinary loss treatment for the entire amount of the claimed Elm Court loss. Mr. Niehus did what petitioners wanted and expected and continued to advocate acceptance by the IRS of petitioners' position with respect to that loss. Petitioners and Mr. Niehus knew, or should have known, that presenting those new and contradictory documents to the second counsel for respondent would likely cause that counsel and other representatives of the IRS involved in this case to continue to be suspicious of, and to have trust and credibility issues with, petitioners and their claims, as certain IRS representatives previously had because of events that

[*31] had occurred during the IRS examination and before they had retained Mr. Niehus to represent them with respect to the IRS examination.

On October 1, 2013, a week after Mr. Niehus had faxed to the second counsel for respondent on September 23, 2013, his September 20, 2013 letter and certain documents that related to the claimed Elm Court loss, the Federal Government closed because of certain funding issues that had arisen in Congress. The Federal Government reopened on October 17, 2013.

After the Federal Government reopened, Mr. Niehus on behalf of petitioners and the second counsel for respondent resumed their settlement discussions with respect to, inter alia, the claimed Elm Court loss. Shortly before the October 28, 2013 Chicago trial session commenced, the second counsel for respondent informed Mr. Niehus and petitioners that he would be willing to settle that major issue as well as the second unresolved major issue, i.e., the claimed 2008 partnership loss, as follows: Petitioners (1) would be entitled for taxable year 2009 to an ordinary loss of $217,728 with respect to the claimed Elm Court loss that they had reported as an ordinary loss deduction in petitioners' second amended 2009 return and would concede the balance (i.e., $218,023) of that claimed loss[19] and (2)

—————————————

[19]In offering to allow petitioners for the taxable year 2009 an ordinary loss of $217,728 with respect to the claimed Elm Court loss, the second counsel for

(continued...)

**[*32]** would concede in full the IRS determination in the notice to disallow their

claimed 2008 partnership loss.[20]

Mr. Niehus recommended to petitioners that they accept the respective bases

on which the second counsel for respondent had offered to resolve the claimed

Elm Court loss and (for reasons set forth in note 20) the claimed 2008 partnership

loss.  Mr. Niehus gave a detailed explanation to petitioners as to why he recom-

---

[19](...continued)
respondent was willing to allow them approximately one-half of the total claimed
Elm Court loss of $435,751 that they had reported as an ordinary loss in
petitioners' second amended 2009 return.

[20]Petitioners were willing to concede in full the claimed 2008 partnership
loss because they were unable to provide documentation to the IRS establishing
that Mr. Shamrock had incurred that loss as they and Mr. Niehus on their behalf
had previously contended before the IRS.  That was because the documents that
petitioners ultimately were able to find at the request of the IRS showed that it was
not Mr. Shamrock who had made capital contributions to the partnership with
respect to which petitioners were claiming the claimed 2008 partnership loss.
Instead, it was a company that Mr. Shamrock owned which had made capital
contributions to that partnership.  When Mr. Niehus was advocating at several
meetings with certain IRS representatives at which petitioners were present
petitioners' position that they were entitled to the claimed 2008 partnership loss,
he was not aware that Mr. Shamrock had not in or before taxable year 2008 made
capital contributions to the partnership with respect to which petitioners were
claiming that loss.  Mr. Niehus became aware of that fact when Mr. Shamrock told
him that the documents that Mr. Shamrock had found showed that a company that
Mr. Shamrock owned had made capital contributions to that partnership.  Before
and at the time petitioners decided to concede in full the claimed 2008 partnership
loss, Mr. Shamrock had no problem with the way in which Mr. Niehus had
advocated petitioners' position to the IRS that they were entitled to that loss.

[*33] mended that they accept the basis of settling the claimed Elm Court loss that the second counsel for respondent had proposed. Consequently, Mr. Shamrock and Ms. Bigg understood very well the consequences of their accepting that proposed basis of settlement as well as the consequences of rejecting it.

Mr. Niehus based his recommendation with respect to the offer of the second counsel for respondent regarding the claimed Elm Court loss on a number of factors that he discussed with petitioners. He first advised petitioners that he believed that the second counsel for respondent would be unwilling to offer to concede an amount of the claimed Elm Court loss of $435,751 that was larger than the $217,728 that he had indicated he was willing to concede.

Mr. Niehus next explained to petitioners that, because the second counsel for respondent was adamant about not allowing petitioners a larger amount of the claimed Elm Court loss, the only two avenues available to them would be to accept the settlement that that counsel had proposed or to litigate that loss. Mr. Niehus further explained to petitioners that if they decided to litigate the claimed Elm Court loss, they would be litigating the entire amount of that loss, not just the portion of that loss that the second counsel for respondent was unwilling to allow.

Mr. Niehus also described for petitioners what he believed to be the so-called hazards of litigating the claimed Elm Court loss, which he told them they

[*34] should take into account in deciding whether to litigate the claimed Elm Court loss. Mr. Niehus informed petitioners that the principal hazard of litigating that issue was that the Court might reject their position that they are entitled to the entire amount of the claimed Elm Court loss as an ordinary loss for the taxable year 2009--a result that would provide them no tax benefit from that claimed loss and that obviously would be worse than the result if they had accepted the settlement offer of the second counsel for respondent. Another litigating hazard about which Mr. Niehus advised petitioners was that the Court might hold that although petitioners had incurred a loss from the disposition of the Elm Court property, that loss was a capital loss, and not an ordinary loss--a result that would provide them virtually no tax benefit[21] from that claimed loss and that obviously would be worse than the result if they had accepted the settlement offer of the second counsel for respondent. Another hazard of litigation was that the Court might find that petitioners failed to establish their tax basis in the Elm Court property and thus had failed to establish that there was any loss on the disposition of that property.

Mr. Niehus also informed petitioners that another factor that they should consider in deciding whether to accept the settlement with respect to the claimed

---

[21]As discussed above, Mr. Niehus had previously advised petitioners that treating the claimed Elm Court loss as a capital loss would provide them with only a $3,000 annual tax benefit over a period of many years. See supra note 17.

[*35] Elm Court loss that the second counsel for respondent had proposed or to reject it and to litigate that issue was the cost of litigation. Mr. Niehus told petitioners that it would be expensive to litigate the claimed Elm Court loss.

After Mr. Niehus explained to petitioners why he was recommending that they accept the settlement offer of the second counsel for respondent with respect to the claimed Elm Court loss, Ms. Bigg told him and Mr. Shamrock that she wanted to accept that offer and thereby put the case pending in the Court behind her.

On October 28, 2013, this case was called from the trial calendar for the Court's October 28, 2013 Chicago trial session (calendar call). The second counsel for respondent appeared on behalf of respondent. Although Mr. Niehus had not entered an appearance in the case and petitioners were acting pro sese, Mr. Niehus appeared at the calendar call on their behalf. The Court asked Mr. Niehus whether he had entered an appearance in the case on behalf of petitioners, to which he responded that he had not. The Court then asked Mr. Niehus whether he had a completed an entry of appearance form to file with the Court, to which he responded that he had not. The Court asked him to explain why he did not have such a completed form to file with the Court. Mr. Niehus replied that he did not expect to be appearing in Court on behalf of petitioners because the second

**[*36]** counsel for respondent and he expected as late as a few days before the commencement of the Court's October 28, 2013 Chicago trial session that the case would be settled. Under the circumstances, the Court recognized Mr. Niehus pro hac vice.

Thereafter at the calendar call, the second counsel for respondent informed the Court that both he and Mr. Niehus believed that they had agreed on a basis on which to settle the issues that remained in the case after the parties had filed the February 28, 2013 stipulation of settled issues. The second counsel for respondent explained that a supplemental stipulation of facts had been prepared but that the parties had not yet signed it. He added that he believed that there was "no disagreement as to the contents of the [supplemental] stip". Instead, according to the second counsel for respondent, "[p]etitioners had some concerns about signing it [supplemental stipulation of settled issues] prior to receiving a computation" that showed the tax that they would owe for each of the years at issue pursuant to the filed February 28, 2013 stipulation of settled issues and the unsigned and unfiled supplemental stipulation of settled issues.

The Court asked Mr. Niehus at the calendar call to elaborate on what the second counsel for respondent had informed the Court regarding the status of the case. The following exchange took place between Mr. Niehus and the Court:

**[*37]** Mr. Niehus: [T]here is [sic] about 50 issues that were originally under audit, 48 were agreed upon. The last two are large and material in nature, and before the Petitioners wanted to know, they wanted to know what the net liability would be, because the last issue took about a year to settle or come to an agreement to. And they'd like to know what the bottom line is before they would settle. We understand in 30 to 60 days that final number will be then reviewed, sent to us, we'd like to review it and then sign off and the matter will be settled. [Emphasis added.]

The Court: Then you don't have a settlement and we'll go to trial.

Mr. Niehus: I'd rather not go because all we're doing is looking to review a computation.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

The Court: \* \* \* if you sign the supplement[al] \* \* \* stipulat[ion of settled] issues and your clients don't like the bottom line number.

Mr. Niehus: Oh, no, they just want to know what it is.

The Court: Okay, they'll know what it is before you submit the decision documents reflect[ing] \* \* \* the supplemental stipulation of settled issues.

Mr. Niehus: Okay, then that's what we'll need.

The Court: \* \* \* I thought you were saying you weren't going to sign the supplemental stipulation of settled issues until you knew and however long it takes

[*38]                         you to do the computations [of] what the [tax] number is.

Mr. Niehus:        Well, we prefer to do that.  If that is not possible then we would sign it today.

The Court:         That's not possible.

Mr. Niehus:        Then we'll sign it today.

The Court:         Okay, do you have it with you?

Mr. Shelton:       We do.

The Court:         Let's sign it right now, but I want your entry of appearance first.

Mr. Shelton:       Judge, the [supplemental] stipulation [of settled issues is] * * * actually made out for Petitioner's [sic] pro se signatures.  If we could have, or if the Court could recall us at the end of the call we could probably get these signed.

Mr. Niehus:        They're right here to sign it now.

The Court:         Oh, so you're--

Mr. Niehus:        My client, the client, the taxpayers are here right now.

The Court:         But you're going to enter an appearance, too?

Mr. Niehus:        Yes.

The Court:         Your signature would have to be on it, too.  Okay, why don't I recall this case at the end of the calendar call.  Will that give you enough time?

**[*39]** Mr. Shelton: It will give us enough time to get Petitioners' signature, if not to reprint new one for Petitioners' counsel's signature, Your Honor.

The Court: He can just add his signature at the bottom of the page, put his name, put his, but I want it, I don't want it without your entry of appearance.

Mr. Niehus: Yes.

The Court: Okay? And if you're not ready at the end of the calendar call then we'll call it later today.

On October 28, 2013, this case was recalled from the trial calendar for the Court's October 28, 2013 Chicago trial session (recall). The second counsel for respondent appeared at the recall on behalf of respondent. Mr. Niehus appeared at the recall on behalf of petitioners. At that recall, the second counsel for respondent informed the Court that the parties wanted to file with the Court a supplemental stipulation of settled issues.

The Court asked Mr. Niehus whether he had an entry of appearance form to file with the Court, to which he replied that he did. The Court asked Mr. Niehus to provide that form to the trial clerk and instructed the trial clerk to "make sure it's in proper order." The Court asked the trial clerk whether the entry of appearance form that Mr. Niehus had provided to her was in proper order, to which she replied that it was. The trial clerk was wrong in her response, but the Court did not know

[*40] that she was wrong at that time. The entry of appearance form that Mr. Niehus had provided to the trial clerk did not show a "Tax Court Bar Number" in the appropriate place in that entry of appearance form that requires such a number to be shown. That was because Mr. Niehus had not applied to be, and consequently was not, admitted to practice before the Court before the October 28, 2013 Chicago trial session commenced. As a result, the Court had not assigned a Tax Court bar number to him.[22]

After the trial clerk informed the Court at the recall, albeit erroneously, that the entry of appearance form that Mr. Niehus had given to her was in proper order, the Court proceeded to discuss with respective counsel for the parties the status of the case. The following exchange between the Court and counsel took place:

| The Court: | [Y]ou have a supplemental stipulation of settled issues that's been signed? |
| Mr. Niehus: | Yes, Your Honor. |
| The Court: | Which, together with the stipulation of settled issues you said was filed some months ago, settles all issues in the case, is that right? |

---

[22]Because Mr. Niehus had not applied to be, and consequently was not, admitted to practice before the Court before the October 28, 2013 Chicago trial session commenced, the entry of appearance form that Mr. Niehus had provided to the trial clerk was not filed with the Court and consequently is not part of the official record in this case. That entry of appearance form is, however, preserved with that record.

**[*41]** Mr. Shelton:      It does, Your Honor.

The Court:      Is that right?

Mr. Niehus:      I agree.

The Court:      Okay, you may approach with the supplemental stipulation of settled issues that will be filed.  And how much time do you need for the stipulated decision document?

Mr. Shelton:      We'd ask for 30 days, Judge.

\*          \*          \*          \*          \*          \*          \*

The Clerk:      30 days is November 27th.

At the Court's direction at the calendar call of this case on October 28, 2013, the supplemental stipulation of settled issues (October 28, 2013 supplemental stipulation of settled issues), which the second counsel for respondent had signed on behalf of respondent and that the parties filed with the Court at the recall of this case on that date, was signed by each petitioner and by Mr. Niehus on behalf of petitioners.  Paragraph 22 of that supplemental stipulation of settled issues, which pertained to the claimed Elm Court loss for petitioners' taxable year 2009,[23] set forth the agreement of respondent and petitioners that "[p]etitioners are

---

[23]Paragraphs 19 through 21 of the October 28, 2013 supplemental stipulation of facts also set forth the agreement of respondent and petitioners that petitioners conceded the three determinations that respondent had made in the

(continued...)

[*42] entitled to claim an ordinary loss in the amount of $217,728 that was not claimed on their 2009 individual income tax return."[24] The following agreement of respondent and petitioners appeared immediately below paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues and immediately above the respective signatures of Mr. Shamrock and Ms. Bigg on behalf of themselves and the signature of the second counsel for respondent on behalf of respondent:[25] "The parties hereby agree to this supplemental stipulation of settlement."

At the recall of this case at the Court's October 28, 2013 Chicago trial session, the Court ordered the parties to submit to the Court on or before November 27, 2013, a date that the second counsel for respondent had requested, stipulated decision documents reflecting the stipulations of settled issues.

After the Court's October 28, 2013 Chicago trial session, the second counsel for respondent had computations (tax computations) undertaken of any

---

[23](...continued)
2008 notice with respect to the taxable year 2008, including the agreement that petitioners conceded the claimed 2008 partnership loss. See supra note 20.

[24]See supra note 19.

[25]As stated above, at the direction of the Court at the calendar call on October 28, 2013, Mr. Niehus also signed the October 28, 2013 supplemental stipulation of settled issues. His signature appeared below the respective signatures of petitioners and the second counsel for respondent.

[*43] deficiency, any addition to tax, and any accuracy-related penalty for which

Mr. Shamrock for the taxable year 2007 was and Mr. Shamrock and Ms. Bigg for

each of the taxable years 2008 and 2009 were liable pursuant to the February 28,

2013 stipulation of settled issues and the October 28, 2013 supplemental stipula-

tion of settled issues that they had signed and filed with the Court.  After those tax

computations had been completed, the second counsel for respondent sent a letter

dated November 20, 2013 (November 20, 2013 letter) to petitioners and enclosed

those tax computations.  He also sent copies of that letter and those tax computa-

tions to Mr. Niehus.  In the November 20, 2013 letter, the second counsel for

respondent stated in pertinent part:

> The IRS has computed the amounts of taxes and penalties that result
> from our settlement in your Tax Court case.  To conclude the case, we
> must file a decision with the court.  Please review the enclosed deci-
> sion and the accompanying computation and if you agree that the
> computation properly reflects our settlement, please sign the original
> and one copy of the decision and return them to my office. * * *

After Mr. Niehus received from the second counsel for respondent and

reviewed the copies of the November 20, 2013 letter and the tax computations,

Mr. Niehus contacted that counsel and pointed out to him a computational error in

respondent's favor with respect to certain itemized deductions that appeared in

those tax computations.  The second counsel for respondent agreed with Mr.

[*44] Niehus that the tax computations did include the error that Mr. Niehus had pointed out. Thereafter, the second counsel for respondent requested that the tax computations be revised to correct that error. He also obtained from the Court an extension of time until December 26, 2013, within which the parties were to submit stipulated decision documents reflecting the parties' stipulations of settled issues.

After the tax computations had been revised to correct the error that Mr. Niehus had pointed out (revised tax computations), the second counsel for respondent sent to Mr. Niehus by fax dated November 25, 2013, a copy of the revised tax computations with a note on the fax transmission sheet that stated in pertinent part: "I reran the numbers * * * to include the adjustments to Itemized Deductions in 2009. Here is the revised computation. I've reviewed the executed stipulations of settled issues and the notices of deficiency and I believe that everything we agreed to in writing comports with this revised computation." The revised tax computations also were sent to Mr. Shamrock and Ms. Bigg on November 25, 2013.

After Mr. Shamrock reviewed the tax computations and thereafter the revised tax computations that the second counsel for respondent had provided to petitioners and Mr. Niehus, he was not pleased with what the revised tax computa-

[*45] tions showed he and Ms. Bigg were required to pay to the IRS for the years at issue. If Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would not have objected to, but would have signed, the decision documents that respondent had prepared for this case and that reflected those revised tax computations, which in turn reflected the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues. That is to say, if Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, Mr. Shamrock would not have contested the settlement with respect to their claimed Elm Court loss to which he and Ms. Bigg had agreed, as reflected in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues, and he would not have refused to sign the decision documents that reflected the agreements of the parties set forth in that stipulation of settled issues as well as in the February 28, 2013 stipulation of settled issues.

Because of his displeasure with what he and Ms. Bigg were required to pay to the IRS for the years at issue, as shown in the revised tax computations, Mr. Shamrock decided to consult, on the same day on which he was provided those revised computations, Mr. Drobny, who had represented him on certain tax

[*46] matters. If Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would not have consulted Mr. Drobny. When Mr. Shamrock spoke with Mr. Drobny about taxable years 2007, 2008, and 2009, Mr. Drobny checked on Mr. Niehus' professional background and learned that after 2009 Mr. Niehus no longer was authorized to practice law in Illinois. Mr. Drobny informed Mr. Shamrock about what he had learned regarding Mr. Niehus' status with the Illinois State bar, about which Mr. Shamrock had been unaware.

When Mr. Shamrock spoke with Mr. Drobny about his displeasure with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, Mr. Drobny also informed Mr. Shamrock about, and gave him a copy of, the Opinion in Gates v. Commissioner, 135 T.C. 1 (2010), (sometimes, Gates Opinion). Mr. Drobny told Mr. Shamrock that he believed that Mr. Niehus had erred in recommending to petitioners that they accept respondent's proposal to settle the claimed Elm Court loss by treating approximately 50 percent of that claimed loss as a deductible ordinary loss, instead of treating 100 percent of that claimed loss as a deductible ordinary loss. Mr. Drobny held that belief because, in his opinion, the Gates Opinion required resolution of the Elm Court loss entirely in petitioners' favor by treating it as a deductible ordinary loss. Mr.

[*47] Drobny did not understand why Mr. Niehus had not brought the <u>Gates</u> Opinion to the attention of any representative of respondent with whom Mr. Niehus and petitioners had dealt during the period they had been negotiating with them in an attempt to resolve, inter alia, the claimed Elm Court loss.

On November 25, 2013, the same day on which Mr. Shamrock was provided the revised tax computations and on which Mr. Shamrock consulted Mr. Drobny about his displeasure with what he and Ms. Bigg were required to pay to the IRS for the years at issue, as shown in those revised tax computations, Mr. Drobny contacted the second counsel for respondent and gave him Form 2848. In that form, Mr. Shamrock, but not Ms. Bigg, authorized Mr. Drobny to represent him before the IRS with respect to tax matters for Mr. Shamrock's taxable years 2004 through 2012.[26] In Form 2848, part II, that Mr. Drobny signed, Mr. Drobny indicated that he was a C.P.A. who was authorized to practice as such in the State

---

[26]As expressly stated in preprinted Form 2828 authorizing Mr. Drobny to represent Mr. Shamrock, the filing of that form with the IRS "automatically revoke[d] all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by" that form. Consequently, the filing of that form automatically revoked as to Mr. Shamrock Form 2848 that Mr. Shamrock (and Ms. Bigg) had filed with the IRS authorizing Mr. Niehus to represent Mr. Shamrock (and Ms. Bigg) with respect to tax matters for the taxable years 2007, 2008, and 2009.

**[\*48]** of Illinois.  On December 2, 2013, Mr. Drobny filed with the Court an entry of appearance form with respect to Mr. Shamrock.

Ms. Bigg was unwilling to retain Mr. Drobny when Mr. Shamrock first retained him with respect to this case, even though Mr. Drobny and/or Mr. Shamrock had informed her that Mr. Niehus was no longer authorized to practice law in Illinois.  That was because Ms. Bigg wanted to put this case behind her.  Shortly thereafter, Ms. Bigg changed her mind and decided to retain Mr. Drobny to represent her with respect to this case.  The reason that Ms. Bigg changed her mind was that Mr. Drobny, who represented to her that he was a tax attorney when he was not, had also represented to her, as he had represented to Mr. Shamrock, that if Mr. Niehus had brought the Gates Opinion to the attention of the represen-tatives of respondent with whom he and petitioners had been dealing, respondent would have conceded as a deductible ordinary loss the entire claimed Elm Court loss, not just 50 percent of that claimed loss as reflected in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues.  Ms. Bigg relied on Mr. Drobny's representations to her and concluded that he was more knowledge-able than Mr. Niehus in that Mr. Drobny was aware of the Gates Opinion about which Mr. Niehus was apparently unaware and which Mr. Drobny represented to her controlled resolution of that claimed loss entirely in petitioners' favor as a

[*49] deductible ordinary loss.  Consequently, Ms. Bigg retained Mr. Drobny to represent her with respect to this case.  Mr. Drobny did not disclose to Ms. Bigg when she retained him or at any time thereafter that in Drobny v. Commissioner, 86 T.C. 1326 (1986), the Court had found him liable for so-called civil fraud under then section 6653(b).[27]  On December 17, 2013, Mr. Drobny filed with the Court an entry of appearance form with respect to Ms. Bigg.

In reliance upon the advice and the representations of Mr. Drobny regarding the Gates Opinion, petitioners refused to sign the decision documents that the second counsel for respondent had prepared reflecting the February 28, 2013 stipulation of settled issues and the October 28, 2013 stipulation of settled issues.  Consequently, on December 17, 2013, respondent filed a motion for entry of decision in which respondent asked the Court to enter a decision in the case that reflected the agreement of the parties as set forth in those stipulations of settled issues.

On December 26, 2013, Mr. Drobny filed on behalf of petitioners a response to respondent's motion for entry of decision.  In that response, Mr. Drobny opposed that motion on behalf of petitioners on essentially two grounds.  The first

---

[27]Sec. 6653(b) is the predecessor of sec. 6663 that Congress enacted to be effective for tax returns, the due date for which (determined without regard to extensions) was after December 31, 1989.

[*50] ground was that Mr. Niehus was no longer an active member of the Illinois State bar when petitioners had authorized him, by signing part I of Form 2848 on June 1, 2011, to represent them with respect to tax matters for the taxable years 2007, 2008, and 2009. Mr. Drobny further indicated in petitioners' response to respondent's motion for entry of decision that Mr. Shamrock and Ms. Bigg were not aware that after 2009 Mr. Niehus no longer was an active member of the Illinois State bar when petitioners had authorized him, by signing part I of Form 2848 on June 1, 2011, to represent them with respect to tax matters for the taxable years 2007, 2008, and 2009. Mr. Drobny claimed on behalf of petitioners in their response to respondent's motion for entry of decision that consequently Mr. Niehus "should not have been allowed to represent petitioners during their audit of 2007-2009."

The second ground that Mr. Drobny advanced on behalf of petitioners in their response to respondent's motion for entry of decision was that "Mr. Niehus improperly handled the issue [claimed Elm Court loss]". That was because, according to Mr. Drobny,

> in Gates v. Comm'r, 135 T.C. 1 (July 1, 2010), this court ruled that the teardown of a former principle [sic] residence and rebuilding the house without occupying it would disqualify the home from the exclusion of gain under Section 121 as a principle [sic] residence. The former principle [sic] residence did not exist according to this

[*51] court and it denied the exclusion. The fact that the Petitioners house was not a principle [sic] residence and they lost $435,751 on the sale should make that deductible because the IRS cannot have it both ways. The aforementioned case was identified easily and should have been presented to the IRS before settling on 1/2 of a deduction that should have been allowed if the Petitioners had adequate representation.

Mr. Niehus' not informing petitioners that after 2009 he no longer was authorized to practice law in Illinois because of his failure to satisfy certain Illinois State bar attorney status requirements and not bringing the Gates Opinion to the attention of respondent's representatives with whom he was dealing on behalf of petitioners did not result in their suffering any prejudice, let alone any injustice, when they agreed to settle the claimed Elm Court loss as set forth in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues.

The Court granted respondent's motion for entry of decision and entered a decision on January 27, 2014, that reflected the parties' February 28, 2013 stipulation of settled issues and the parties' October 28, 2013 supplemental stipulation of settled issues.

On February 5, 2014, Mr. Drobny filed on behalf of petitioners a motion to vacate or revise pursuant to Rule 162 (motion to vacate). In support of that motion, petitioners advanced the following two grounds: "'fraud on this Court'

[*52] and breach of contract by respondent." The Court denied petitioners' motion to vacate on February 19, 2014.

On March 12, 2014, Mr. Drobny filed on behalf of petitioners a motion for reconsideration of findings or opinion pursuant to Rule 161. In that motion, Mr. Drobny asked again on behalf of petitioners that the Court vacate the decision entered in this case on January 27, 2014. In support of that motion, Mr. Drobny alleged that respondent had a duty to disclose to petitioners that Mr. Niehus "did not qualify to represent them." On March 18, 2014, the Court denied petitioners' motion for reconsideration of findings or opinion pursuant to Rule 161.

On March 31, 2014, Mr. Drobny filed on behalf of petitioners another motion to vacate or revise pursuant to Rule 162. That motion was not filed within the time prescribed by Rule 162. On April 2, 2014, the Court denied that motion.

Petitioners timely appealed the Court's decision in this case to the Court of Appeals. The Court of Appeals vacated the Court's Order and Decision entered on January 27, 2014, and remanded this case "for further proceedings, in accordance with the decision of this court entered on September 22, 2014." In the order of the Court of Appeals filed on September 22, 2014, the Court of Appeals stated in pertinent part:

**[*53]** Although the couple [petitioners] filed their petition pro se, they had hired Grant Niehus, who told them he is a lawyer and CPA, to represent them before the IRS and the Tax Court. Niehus has a law degree but hasn't been authorized to practice law since 2009 and he is not a CPA.[28]

\*       \*       \*       \*       \*       \*       \*

The Tax Court's rules require that the parties stipulate to relevant issues whenever possible; generally these stipulations are binding but may be altered or withdrawn when "justice requires." TAX CT. R. 91(a), (e). The rules give the Tax Court discretion to relieve a party of a stipulation. \* \* \* The Commissioner likened the petitioners' stipulations to "settlement agreements" that are "governed by general principals of contract law." But the petitioners signed <u>pretrial</u> stipulations, which did not reflect the computation of the deficiency and penalties or purport to resolve conclusively the petitioners' liability. See <u>Lovenguth v. C.I.R.</u>, 93 T.C.M. (CCH) 1040, at \*3-\*4 (2007)

---

[28]On the record before the Court that was established at the March 30, 2015 evidentiary hearing that it held on remand from the Court of Appeals, the Court is unable to find that Mr. Niehus told petitioners that he was a C.P.A. Nor is the Court able to find on that record that petitioners had hired Mr. Niehus to represent them before this Court. In fact, we have found that Mr. Niehus made it clear to Mr. Shamrock and Ms. Bigg when they first retained him that although he was willing to represent them in attempting to resolve with the IRS all of the examination issues for taxable years 2007, 2008, and 2009, he was unwilling to represent them in the event that they and the IRS were unable to reach a mutually satisfactory resolution of all of those examination issues and they wanted to litigate the unresolved issues. That was because, as he told Mr. Shamrock and Ms. Bigg at their first meeting, he was not a trial lawyer. We have also found that Mr. Niehus indicated to petitioners that in the event that they wanted a trial with respect to any unresolved examination issues, he would recommend a trial lawyer to represent them. We have further found that during Mr. Niehus' representation of petitioners, which ended in December 2013, they never asked him to recommend a trial lawyer to them.

**[\*54]** (distinguishing stipulations under Rule 91 from "settlement stipulations" and stating that Rule 91 "allows us to consider factors that might not be sufficient to upset a contract").  The Tax Court, by enforcing the petitioners' stipulations solely for the "reasons stated" by the Commissioner, likewise failed to consider the petitioners' asserted justification for setting aside those stipulations.

\*          \*          \*          \*          \*          \*          \*

The Commissioner insisted that the parties had "settled the issue 50/50 because the outcome was uncertain" for both sides, not "because Mr. Niehus 'improperly handled the issue.'"  But that's the Commissioner's view, not a determination made by the Tax Court. The court's decision is silent about Niehus's deceit, and that decision does not show that the judge exercised any discretion when accepting the Commissioner's request that the petitioners' stipulations be enforced.

The Commissioner makes much of the fact that the petitioners did not have a right to effective assistance of a lawyer in their civil tax case. \* \* \*  As we understand the Commissioner's argument, a taxpayer should be bound by any stipulation induced by his representative's deceit so long as the Commissioner was unaware of the fraud. That contention \* \* \* does not resolve whether these petitioners have articulated a valid reason to set aside the stipulation relating to the 2009 [claimed Elm Court] loss.  Even though the petitioners had no right to an effective lawyer, the petitioners and even the Commissioner's counsel all believed they were dealing with an attorney authorized to represent taxpayers before the IRS and the Tax Court. The Commissioner minimizes that deception, but the Tax Court should have evaluated whether it provided good cause to set aside the petitioners' stipulations.

The Court of Appeals issued a mandate on November 17, 2014, in accordance with its order filed on September 22, 2014, and its judgment filed on

[*55] September 23, 2014, and, as discussed above, remanded this case for further proceedings in accordance with that order and decision.

On November 25, 2014, this Court issued an Order in which it ordered the parties to "file a joint report in which they * * * [were to] indicate what they believe should be done in this Court on remand in order to comply with the order and judgment of the U.S. Court of Appeals for the Seventh Circuit."

On December 11, 2014, the parties filed a joint status report (parties' joint status report). In that report, the parties set forth their respective views regarding further proceedings in this Court. The view of petitioners, as set forth by Mr. Drobny in the parties' joint status report, was that

> based upon the facts [alleged in the parties' joint status report by Mr. Drobny on behalf of petitioners] and law cited by the Court of Appeals, a hearing on this matter is unnecessary because the facts in this case are self evident. Asking the taxpayers [petitioners] or Mr. Niehus about this matter in a hearing does not change the fact that Niehus falsely represented to taxpayers, the Commissioner, and this Court that he was unqualified [sic] to practice and indeed gave the taxpayers clearly erroneous advice.

The view of respondent, as set forth in the parties' joint report, was that the Court should "set this case for an evidentiary hearing". According to respondent, "[p]etitioners should be put to their proof at an evidentiary hearing where a record can be built and, after cross-examination, petitioners' credibility can be gauged by

**[\*56]** the Court." Respondent then proffered in the parties' joint status report that

the following facts would be established at an evidentiary hearing:

> (1) petitioners were full participants in the events leading to their stipulations; (2) petitioners caused their predicament and tied Niehus' hands by failing to provide Niehus the documents necessary to substantiate their positions; (3) petitioners went to Sheldon Drobny after they received respondent's final settlement computations but before they learned that Niehus was not licensed to practice law, i.e., their dissatisfaction with the settlement had nothing to do with Niehus' licensure [sic] and everything to do with the amount of money they owed; and (4) petitioners did not, as the Seventh Circuit believed, sign mere pretrial stipulations (or, in Tax Court parlance, stipulations of fact) but rather settlement stipulations, which are held to a higher standard.

In its January 15, 2015 Order, the Court set this case for an evidentiary

hearing at a special session that was to, and did, take place on March 30, 2015, in

Chicago. As stated in that Order, the March 30, 2015 evidentiary hearing was set

for the purpose of giving the parties the opportunity to present evidence as to

whether the parties' February 28, 2013 stipulation of settled issues and the parties'

October 28, 2013 supplemental stipulation of settled issues should be set aside.

On March 13, 2015, petitioners filed a second supplement to the prehearing

memorandum that they had filed on January 21, 2015. In that second supplement,

petitioners narrowed the scope of the March 30, 2015 evidentiary hearing to

**[\*57]** whether only paragraph 22 of the parties' October 28, 2013 supplemental stipulation of settled issues should be set aside.[29]

OPINION

It is petitioners' position that the Court should set aside paragraph 22. Respondent disagrees.

Before addressing the parties' respective positions, the Court summarizes its evaluation of the following witnesses whom respondent called as witnesses at the March 30, 2015 evidentiary hearing:[30] Mr. Shamrock, Ms. Bigg, Mr. Niehus,

---

[29]Paragraph 22 of the parties' supplemental stipulation of settled issues pertains to the claimed Elm Court loss that petitioners had raised as an affirmative issue in their second amended 2009 return. Although Mr. Shamrock took the position during his testimony at the March 30, 2015 evidentiary hearing that the entire February 28, 2013 stipulation of settled issues and the entire October 28, 2013 supplemental stipulation of settled issues should be set aside, he changed his mind upon prodding by Mr. Drobny at that hearing. (For convenience, the Court will sometimes refer to paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues as paragraph 22.)

[30]Petitioners did not call any witnesses at the March 30, 2015 evidentiary hearing. Instead, they chose to have Mr. Drobny cross-examine respondent's witnesses at that hearing.

[*58] Terrence Brennan,[31] and Lauren May.[32]  Except for the testimony of Mr.

Shamrock, the Court found the respective testimonies of respondent's witnesses to

be credible.  With respect to Mr. Shamrock, the Court did not find his testimony to

be credible in certain material respects.  In addition, the Court found that he had a

selective memory during the second counsel for respondent's examination of him

at the March 30, 2015 evidentiary hearing.  The Court finds that Mr. Shamrock's

selective memory in responding to the second counsel for respondent's questions

was nothing more than an attempt on his part to evade answering certain of those

questions that he wanted to avoid answering because he believed that those

answers, if truthful, would have not have supported petitioners' position that

paragraph 22 should be set aside.  The Court will not rely on Mr. Shamrock's

testimony to establish petitioners' position that the Court should set aside para-

graph 22.  See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

---

[31]Terrance Brennan is the Appeals officer who met with petitioners and Mr. Niehus after petitioners filed the petition in an attempt to settle some or all of the examination issues.

[32]Lauren May is the first counsel for respondent who met with petitioners and Mr. Niehus after the petition was filed and after petitioners and Mr. Niehus had met with the Appeals officer.  It was she who signed the February 28, 2013 stipulation of settled issues on behalf of respondent and who discussed with petitioners and Mr. Niehus possible settlement of petitioners' claimed Elm Court loss.  They were unable to reach a basis on which to settle the claimed Elm Court loss issue.

**[\*59]** The Court turns now to the mandate of the Court of Appeals. As the Court understands the Court of Appeals' order filed on September 22, 2014, which is part of that mandate, the Court of Appeals concluded that the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues are not stipulations of settlement because those stipulations of settled issues "did not reflect the computation of the deficiency and penalties or purport to resolve conclusively the petitioners' liability." Shamrock v. Commissioner, No. 14-1916, order at 3 (7th Cir. Sept. 22, 2014); see Shah v. Commissioner, 790 F.3d 767, 771 (7th Cir. 2015). Instead, according to the Court of Appeals, the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues are governed by Rule 91.

Rule 91 governs "STIPULATIONS FOR TRIAL". In the case of stipulations of settlement or stipulations of settled issues, such as the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues, the Court has held that that type of stipulation will not be set aside unless there is a showing of a "lack of formal consent, fraud, mistake, or some similar ground". Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 335 (1997), aff'd without published opinion, 208 F.3d 205 (3d Cir. 2000).

**[\*60]** The Court of Appeals itself has held that courts should be hesitant to set aside agreements of settlement that the parties reached knowingly and voluntarily. See, e.g., Billhartz v. Commissioner, 794 F.3d 794, 799 (7th Cir. 2015) (treating a settlement agreement that did not set forth the deficiency in Federal estate tax to be paid as a result of the settlement agreement and that consequently did not resolve definitively the amount of the estate's liability as a contract, not as a stipulation subject to Rule 91).

Assuming arguendo, as the Court of Appeals concluded, that the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues are governed by Rule 91, we consider Rule 91(e), which addresses the binding effect of a stipulation governed by Rule 91. That Rule provides that a stipulation is to be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. Rule 91(e) further provides that the Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires.

The Court has concluded that, "[w]ith 'justice' as our standard, we do have broad discretion to determine [under Rule 91(e)] when it is appropriate to set aside a stipulation." Lovenguth v. Commissioner, T.C. Memo. 2007-70, 2007 WL

**[*61]** 922231, at *3.  However, the Court has also concluded that its discretion in setting aside a stipulation under Rule 91(e) "is tempered by the importance of making stipulations stick--we enforce stipulations unless not just 'injustice,' but 'manifest injustice' would result."  Id.  In exercising its discretion under Rule 91(e), the Court may "consider factors that might not be sufficient to upset a contract."  Id. at *4.  That is to say, "something less than a contractual defense is a permissible ground for letting one party to a pretrial stipulation out of his agreement."  Id.

As we understand petitioners' position, they maintain that paragraph 22 must be set aside because when they signed the stipulations of settled issues they relied on Mr. Niehus's representation that he was authorized to practice law in Illinois when in fact he was not.  According to petitioners, those facts, standing alone, "denied [p]etitioners adequate representation" and show that they were not well represented by Mr. Niehus and had suffered injustice and prejudice.  The Court agrees with respondent that "[p]etitioners are essentially arguing per se injustice" is present in this case for purposes of Rule 91(e) (petitioners' per se injustice argument).

Before considering the merits of petitioners' per se injustice argument, the Court notes that under that argument petitioners logically should be asking the

**[\*62]** Court to set aside not only paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues but also that entire supplemental stipulation of settled issues and the entire February 28, 2013 stipulation of settled issues.[33]

The Court considers now petitioners' per se injustice argument. The Court rejects that argument because it is legally flawed and factually flawed. The Court addresses first why petitioners' per se injustice argument is legally flawed. The Court has not applied, and will not apply here, any kind of per se rule in determining whether under Rule 91(e) "justice requires" the Court to exercise its discretion to "permit a party to a stipulation [governed by Rule 91] to qualify, change, or contradict a stipulation". See, e.g., Lovenguth v. Commissioner, 2007 WL 922231, at \*3 (quoting Rule 91(e)). The Court has applied, and will apply here, a facts and circumstances test in determining whether to exercise its discretion under Rule 91(e). See, e.g., id.

_____

[33]The Court believes that the reason petitioners are asking the Court to set aside only paragraph 22, which is illogical and inconsistent with the reasons they advance for asking the Court to do so, is that they believe on the basis of Mr. Drobny's advice that this Court will set aside that paragraph or the Court of Appeals will if this Court does not. In that event, the other IRS examination issues that petitioners conceded in the parties' stipulations of settled issues and that resulted in a substantial increase in their ordinary income for each of the taxable years 2007, 2008, and 2009 would be offset dollar for dollar, thereby reducing the amount of tax that petitioners would otherwise have been required to pay for each of those years because of their concessions.

**[*63]** In addition, certain caselaw of the Court of Appeals and the State of Illinois, as well as certain rules of the Supreme Court of Illinois (Illinois Supreme Court), highlights the legal flaws in petitioners' per se injustice argument. In considering that argument as it relates to Mr. Niehus' no longer being authorized to practice law in Illinois after 2009 because he failed to pay required dues after that year, Reese v. Peters, 926 F.2d 668, 669 (7th Cir. 1991), provides helpful insight. In that case, a defendant in a criminal case claimed that his representation at his criminal trial by a lawyer who had been suspended from the Illinois State bar for failing to pay required dues was an "automatic" violation of his right to counsel under the Sixth amendment of the U.S. Constitution (Sixth Amendment). According to the defendant, "a lawyer who has been suspended from the bar is always ineffective assistance of counsel" for purposes of the Sixth Amendment. Id. Although in considering the defendant's position in Reese the Court of Appeals was addressing the meaning of the word "counsel" in the Sixth Amendment, the Court finds the reasoning of that court in rejecting that position to be instructive in considering petitioners' per se injustice argument. In Reese, the Court of Appeals, which was willing to proceed on the assumption that the lawyer who had represented the defendant at his criminal trial "could have been imprisoned for unauthorized practice of law", id., examined the history of the adoption of the Sixth

**[\*64]** Amendment.  The Court of Appeals concluded on the basis of that examination that the "constitutional question" under the Sixth Amendment was "whether the court has satisfied itself of the advocate's competence and authorized him to practice law."  Id. at 670.  According to the Court of Appeals,

> persons who obtain [legal] credentials by fraud * * * are classes apart from persons who satisfied the court of their legal skills but later ran afoul of some technical rule.  Lawyers who do not pay their dues violate a legal norm, but not one established for the protection of clients; suspensions used to wring money from lawyers' pockets do not stem from any doubt about their ability to furnish zealous and effective assistance.

Id.

The Court of Appeals ended its discussion of the defendant's Sixth Amendment argument by observing:

> Illinois may if it wishes annul the convictions of persons represented by lawyers whose licenses have been suspended for financial reasons. But the unpublished decision in Reese's case, together with People v. Elvart, 189 Ill. App. 3d 524, 136 Ill. Dec. 807, 545 N.E.2d 331 (1st Dist. 1989), shows that Illinois does not doubt the ability of lawyers suspended for nonpayment of dues to furnish effective assistance.

Id.; see Ill. Sup. Ct. R. 756(i) (attorney who fails to pay dues may be reinstated as a matter of course upon paying the dues and certain fees).

In Reese, the focus of the Court of Appeals in rejecting the defendant's Sixth Amendment argument was on whether a court was satisfied that the lawyer

**[\*65]** was competent to practice law and had in fact authorized the lawyer to do so. The Illinois Supreme Court had authorized Mr. Niehus to practice law in Illinois on May 1, 1980, and he was authorized to do so for approximately three decades thereafter. Since he was first admitted to practice law in Illinois in 1980, Mr. Niehus has never been disciplined or disbarred. There is nothing in the record to support any finding that after 2009, when Mr. Niehus failed to pay periodic dues to the Illinois State bar, he was stripped of his years of technical knowledge, training, and experience and was no longer competent to practice law merely because he failed to pay those required dues. See Reese, 926 F.2d 668. Indeed, the record rejects any such finding.

The Court considers next the legal flaws in petitioners' per se injustice argument as it relates to Mr. Niehus' no longer being authorized to practice law in Illinois after 2009 because he did not satisfy certain CLE requirements after that year. The Court notes initially that the Illinois State bar did not have CLE requirements until September 29, 2005, and that the first period with respect to which Mr. Niehus was required to file a report with the Illinois State bar regarding his compliance with those CLE requirements did not end until June 30, 2009. See Ill. Sup. Ct. R. 790, 794(a) and (b), 796.

**[\*66]** Ill. Sup. Ct. Rule 796(e) specifies that the consequence of the removal from the so-called master roll of attorneys authorized to practice law in Illinois of an attorney who has failed to satisfy the Illinois State bar's CLE requirements "is not a disciplinary sanction." Indeed, Ill. Sup. Ct. Rule 796(h) provides that such an attorney may be reinstated as an attorney authorized to practice law in Illinois by paying a fee and showing proof that the attorney has sufficient CLE credits for the periods during which the attorney had failed to comply with the Illinois State bar CLE requirements. Similarly, Ill. Sup. Ct. Rule 756(i) provides that an attorney who no longer is authorized to practice law in Illinois because the attorney failed to pay required annual dues (so-called annual registration fee) to the Illinois State bar may be reinstated as an attorney authorized to practice law in Illinois by registering and paying prescribed fees for each of the periods during which the annual fee was not paid. Illinois thus treats in essentially the same manner reinstatement to practice law after a failure to satisfy periodically certain CLE requirements and reinstatement to practice law after a failure to pay required dues. The Court believes that the reasoning of the Court of Appeals in <u>Reese</u> as to why there was not an "automatic" violation of a criminal defendant's Sixth Amendment right to counsel where the defendant was represented at his criminal trial by an attorney who no longer was authorized to practice law in Illinois for failure to pay

[*67] required dues to the Illinois State bar would apply where the defendant was represented at his criminal trial by an attorney who no longer is authorized to practice law in Illinois for failure to satisfy certain CLE requirements of the Illinois State bar. As the Court found above with respect to Mr. Niehus' failure after 2009 to pay required dues to the Illinois State bar, there is nothing in the record to support any finding that after 2009, when Mr. Niehus failed to satisfy certain CLE requirements, he was stripped of his years of technical knowledge, training, and experience and was no longer competent to practice law merely because he failed to satisfy those requirements. Cf. Reese, 926 F.2d 668. Indeed, the record rejects any such finding.

The Court turns now to why petitioners' per se injustice argument is factually flawed. The short answer is that the facts that the Court has found belie that argument. Contrary to petitioners' unfounded contentions, the Court has found that Mr. Shamrock refused to sign the decision documents because (1) he was not pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue and (2) Mr. Drobny made a representation to him, and shortly thereafter to Ms. Bigg,[34] that if Mr. Niehus had

---

[34]Ms. Bigg was willing to sign the decision documents that the second counsel for respondent had had prepared in order to put this case behind her. Ms.

(continued...)

**[\*68]** brought <u>Gates v. Commissioner</u>, 135 T.C. 1, to the attention of respondent's representatives, respondent would have conceded as a deductible ordinary loss the entire claimed Elm Court loss, not just 50 percent of that claimed loss as reflected in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues. The Court also has found that if Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would have signed the decision documents that respondent had prepared and that reflected the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues. The Court also believes that if Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would not have consulted and retained Mr. Drobny to represent petitioners in this case. If Mr. Shamrock had not consulted and retained Mr.

---

34(...continued)
Bigg changed her mind because Mr. Drobny, who represented to her that he was a tax attorney when he was not, had also represented to her, as he had represented to Mr. Shamrock, that if Mr. Niehus had brought <u>Gates v. Commissioner</u>, 135 T.C. 1 (2010), to the attention of respondent's representatives, respondent would have conceded as a deductible ordinary loss under sec. 165 the entire claimed Elm Court loss, not just 50 percent of that claimed loss as reflected in paragraph 22. Ms. Bigg relied on Mr. Drobny's representations to her, as did Mr. Shamrock, and concluded that Mr. Drobny was more knowledgeable than Mr. Niehus in that Mr. Drobny was aware of the <u>Gates</u> Opinion about which Mr. Niehus was apparently unaware.

[*69] Drobny, Mr. Drobny would not have made representations to him, and shortly thereafter to Ms. Bigg, about the Gates Opinion, which, as discussed below, the Court concludes are erroneous.

In the Gates Opinion, the taxpayers razed their principal residence on certain real property that they owned. Thereafter, they constructed a new residence on the same real property, sold the real property before occupying the new residence, and realized a gain from that sale that exceeded $500,000. See id. at 2-3. The taxpayers in Gates claimed that $500,000 of that gain was excludible from their income under section 121, which provides that gross income does not include certain amounts of gain from the sale of property if a taxpayer used the property as a principal residence for at least two of the five years immediately preceding the sale. See id. at 5-6. The Court held in Gates that the taxpayers were not entitled to exclude any gain from the sale of the property in question. That was because, after they razed their principal residence on the property and built a new residence thereon, they did not reside in the new residence for at least two years before selling that property. See id. at 13.

The Gates Opinion is inapposite to the resolution of whether petitioners are entitled under section 165 to deduct as an ordinary loss the claimed Elm Court loss. At best, the Gates Opinion arguably might provide some support for a

**[*70]** contention by petitioners that, because they never occupied the new house that they had built on the Elm Court property before they sold it, the new house was not their residence at the time of that sale and thus was not used by them for a personal use at that time.[35]  See sec. 1.165-9(b), Income Tax Regs.

Mr. Droby seems to believe, and he evidently represented to petitioners, that under the Gates Opinion if the new house on the Elm Court property was not their principal residence when they sold it in 2009, petitioners are automatically entitled to deduct under section 165 the claimed Elm Court loss as an ordinary loss.  Mr. Drobny's belief and representations to petitioners are wrong.

The Gates Opinion addressed only whether $500,000 of the gain that the taxpayers there realized on the sale of a new house that they had built on the real property where their personal residence had been located was to be excluded under section 121.  The Gates Opinion did not address the deductibility of a loss under section 165, which is the issue presented by the claimed Elm Court loss.  Indeed, the taxpayers in the Gates Opinion did not even have a loss that they wanted to

---

[35]Respondent conceded at the March 30, 2015 evidentiary hearing that the new house on the Elm Court property was no longer petitioners' principal residence when they sold it in 2009.  However, respondent made no other concessions regarding that property at that hearing.

[*71] deduct.  They had a gain that they wanted to exclude from their income under section 121.

It is section 165, not section 121, that governs whether petitioners are entitled to deduct the claimed Elm Court loss as an ordinary loss.  Under section 165(c)(1) and (2), taxpayers, like petitioners, who are individuals are not entitled to deduct under section 165(a) as an ordinary loss a loss from the sale of property unless the loss was incurred in a trade or business or in a transaction entered into for profit.  The Gates Opinion does not even mention section 165, let alone control or resolve questions, including the following legal and factual questions, that must be considered in determining whether petitioners are entitled to ordinary loss deduction treatment under that section:  (1) What is petitioners' basis in the Elm Court property in question?  See secs. 165(b), 1011.  (2) Was the loss from the sale of the Elm Court property incurred in a trade or business?  See secs. 165(c)(1), 162.  (3) Was the loss from the sale of the Elm Court property incurred in an activity in which Mr. Shamrock engaged with the intent of making a profit?  See secs. 165(c)(2), 183.  (4) Was the Elm Court property a capital asset?  See secs. 165(f), 1221.

The Gates Opinion has nothing to do with, does not discuss, and does not govern whether property is used in a trade or business, see sec. 165(c)(1), or

[*72] whether property is used in a transaction entered into for profit, see sec. 165(c)(2).  The Gates Opinion simply does not control, as Mr. Drobny erroneously believes and as he erroneously represented to petitioners, resolution of the claimed Elm Court loss, let alone a resolution of that issue that would allow them to deduct under section 165 as an ordinary loss the entire amount (i.e., $435,751) of that claimed loss.

Petitioners' per se injustice argument is also factually flawed because that argument appears to proceed on the factual assumption that, because after 2009 Mr. Niehus no longer was authorized to practice law in Illinois on account of his failure to satisfy certain Illinois State bar attorney status requirements and because he had failed to bring the Gates Opinion to the attention of respondent's represen-tatives with whom he was dealing on petitioners' behalf, petitioners were not well represented by him and consequently they suffered prejudice when they agreed to settle the claimed Elm Court loss as set forth in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues.  The Court's findings belie those contentions.  The Court has found that Mr. Niehus' not informing petitioners that after 2009 he no longer was authorized to practice law in Illinois on account of his failure to satisfy certain Illinois State bar attorney status requirements and not bringing the Gates Opinion to the attention of respondent's representatives with

**[\*73]** whom he was dealing on behalf of petitioners did not result in their suffering any prejudice, let alone any injustice, when they agreed to settle the claimed Elm Court loss as set forth in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues.

Not only did petitioners not suffer any prejudice, let alone injustice, when they agreed to settle the claimed Elm Court loss as set forth in paragraph 22, but, contrary to the suggestion of petitioners in their posthearing memorandum, the Court has found that they were well represented by Mr. Niehus. See Reese, 926 F.2d at 668-670; Lovenguth v. Commissioner, 2007 WL 922231, at \*4 (citing Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261, 263 (5th Cir. 1961)); see also Ill. Sup. Ct. R. 756(i), 796(e), (h). In short, the Court has found that throughout his representation of Mr. Shamrock and Ms. Bigg from early June 2011 until December 2013 Mr. Niehus provided to them competent, valuable, diligent, and effective assistance. He did so in the face of and despite petitioners' acknowledgement at their first meeting with him that he would be starting at a disadvantage if they were to retain him to represent them with respect to the IRS examination. In fact, during their initial meeting with Mr. Niehus, Mr. Shamrock and Ms. Bigg characterized the then-current situation with respect to the IRS examination of the taxable years 2007, 2008, and 2009 as a "mess", an assessment

[*74] with which Mr. Niehus agreed after he learned more about the IRS examination, the events that occurred during that examination, how it had been handled by petitioners' prior representative, and the trust and credibility issues that certain IRS representatives had had with petitioners before they retained him. Mr. Shamrock and Ms. Bigg understood fully when they had their first meeting with Mr. Niehus in June 2011 that Mr. Niehus was being placed in the difficult situation of persuading the IRS to trust and accept what Mr. Shamrock and Ms. Bigg maintained were the salient facts regarding the examination issues, including the claimed Elm Court loss. That was because Mr. Shamrock and Ms. Bigg knew before that initial meeting took place that, as a result of certain events that had occurred during the IRS examination, certain representatives of the IRS who were involved in that examination already had grown suspicious of, and had trust and credibility issues with, them and their claims regarding at least some of the examination issues.

Mr. Niehus set a goal for himself and petitioners when he agreed to represent them at the end of the initial meeting that he had with them in June 2011. Mr. Niehus advised petitioners that they and he, as their representative, needed to address with the IRS the examination issues with a goal of resolving all of them and avoiding litigating any of them. In furtherance of that goal, Mr. Niehus

**[\*75]** engaged in considerable negotiations with various IRS representatives. In particular, the agreement of the parties with respect to the claimed Elm Court loss as set forth in paragraph 22 was the result of considerable negotiations and bargaining by Mr. Niehus on behalf of petitioners. See Lovenguth v. Commissioner, 2007 WL 922231, at \*4 (citing Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d at 263); Markin v. Commissioner, T.C. Memo. 1989-665, 58 T.C.M. (CCH) 994, 996 (1989). Those negotiations proved to be difficult not only because of the reasons discussed previously but also because petitioners had not even raised the claimed Elm Court loss until they filed their second amended 2009 return. Petitioners did not claim that loss in their 2009 return or in their first amended 2009 return. In fact, Mr. Shamrock and Ms. Bigg had originally claimed "developer expenses" of $162,898 in Schedule C, that they had included as part of their 2009 return and that related to what was described in that schedule as Ms. Bigg's "DENTAL PRACTICE & DEVELOPER". However, in the worksheet relating to the claimed Elm Court loss that they included as part of the second amended 2009 return, petitioners explained, inter alia, that "developer expenses" of $162,898 had been "TRANSFERRED TO FROM [sic] 4797", which was from the form titled "SALES OF BUSINESS PROPERTY" in which they reported that claimed loss for the first time.

**[*76]** The Court now highlights some of the competent, valuable, diligent, and effective assistance that Mr. Niehus provided petitioners with respect to the IRS examination issues. Mr. Niehus assisted Mr. Shamrock and Ms. Bigg in identifying, locating, and gathering the documents that they needed to present to the IRS in order to substantiate the position that they had taken with respect to each of the examination issues for each of the taxable years 2007, 2008, and 2009, including the claimed Elm Court loss that they had raised in their second amended 2009 return. Mr. Niehus also prepared and sent to the IRS letters in which he advanced arguments explaining how and why the documents that Mr. Shamrock and Ms. Bigg provided to the IRS and the applicable tax law supported each of those positions and advocated acceptance of each of those positions. In addition, Mr. Niehus, accompanied by Mr. Shamrock and Ms. Bigg, had a number of meetings with representatives of the Appeals Office as well as with representatives of the Chief Counsel's office that took place both before and after they filed the petition commencing this case. During those various meetings, Mr. Niehus continued to (1) advance arguments explaining how and why the documents that Mr. Shamrock and Ms. Bigg provided to the IRS and the applicable tax law supported each of their positions with respect to each of the examination issues for each of the taxable years 2007, 2008, and 2009, including the claimed Elm Court loss that

[*77] they had raised in their second amended 2009 return and (2) advocate acceptance of each of those positions. During those meetings, Mr. Niehus was proactive in protecting the interests of his clients.

Mr. Niehus' competent, valuable, diligent, and effective representation of petitioners continued after petitioners filed the petition, thereby commencing this case. As detailed in the Court's findings of fact Mr. Niehus corresponded and met, along with petitioners, at various times with the Appeals officer in an attempt to negotiate a settlement of all of the examination issues, including the Elm Court loss. With respect to the claimed Elm Court loss, around February 2013 the Appeals officer ultimately offered to settle that issue by allowing petitioners a loss of $50,000 with respect to the Elm Court property. That settlement offer amounted to a concession by respondent of only approximately 11 percent of the $435,751 loss that petitioners had claimed with respect to that property in their second amended 2009 return. Mr. Niehus informed the Appeals officer that he believed that petitioners had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss. The Appeals officer was unwilling to increase the $50,000 IRS Appeals Office settlement offer. Mr. Niehus advised petitioners to reject that offer, and they did.

[*78] By February 2013, the Appeals officer and Mr. Niehus had been able to reach a basis of settlement at the IRS Appeals Office as to each of the examination issues except the claimed Elm Court loss and the claimed 2008 partnership loss. Subsequently, the IRS Appeals Office returned the case to the first counsel for respondent for preparation for trial at the Court's March 11, 2013 Chicago trial session. Mr. Niehus' competent, valuable, diligent, and effective representation of petitioners continued after the Appeals officer returned the case to that counsel for trial preparation. Mr. Niehus and the first counsel for respondent discussed the two remaining major issues at the Branerton conference.[36] In those discussions, Mr. Niehus continued to advocate on petitioners' behalf, inter alia, that petitioners were entitled to ordinary loss treatment for the entire amount of the claimed Elm Court loss. He continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

Not only was the nature (i.e., ordinary vs. capital) of the claimed Elm Court loss still in dispute at the Branerton conference with the first counsel for respondent, but the claimed tax basis of petitioners in the Elm Court property and thus

_____

[36]Mr. Niehus also advanced arguments at the Branerton conference with the first counsel for respondent that petitioners should not be liable for the accuracy-related penalties under sec. 6662(a) that respondent had determined in the respective notices to impose for the taxable years 2007, 2008, and 2009. See supra note 12.

[*79] the amount, if any, of the claimed loss on the disposition of that property also were in dispute.

On February 22, 2013, the first counsel for respondent sent to petitioners, who were pro sese in this case,[37] the February 22, 2013 letter and sent a copy of that letter to Mr. Niehus. In that letter, the first counsel for respondent summarized the then status of the case in pertinent part as follows:

> You agreed that the only remaining issues in your case were 1) the Libertyville partnership losses claimed on your 2008 income tax return[] [claimed 2008 partnership loss] and 2) whether, and/or to what extent you are entitled to claim a loss from the sale of the property located at 1249 Elm Court. We also discussed that we would need additional documentation in order to resolve the remaining issues. Due to your case being on the [Court's] March 11, 2013 Trial Calendar, we agreed that it would be best to file a motion for continuance on your case in order to allow you additional time to provide the additional documentation.

> Accordingly, I have prepared a stipulation of settled issues and joint motion for continuance of trial. The stipulation of settled issues reflects the issues that were agreed to at Appeals. Please sign in blue ink the original and three copies of the stipulation of settled issues and the joint motion for continuance of trial. * * *

On February 28, 2013, petitioners, not Mr. Niehus, and the first counsel for respondent on behalf of respondent signed a stipulation of settled issues (i. e., February 28, 2013 stipulation of settled issues) and filed that stipulation with the

---

[37]See supra note 9.

[*80] Court. The February 28, 2013 stipulation of settled issues resolved each of the examination issues for taxable years 2007 and 2009 except the claimed Elm Court loss and none of the examination issues for taxable year 2008, including the claimed 2008 partnership loss.

Mr. Niehus' competent, valuable, diligent, and effective representation of petitioners continued after the parties filed with the Court the February 28, 2013 stipulation of settled issues. Mr. Niehus continued settlement discussions with a different counsel for respondent, namely, the second counsel for respondent, with respect to the two major issues that remained unresolved in the case, i.e., the claimed Elm Court loss and the claimed 2008 partnership loss. Mr. Niehus advocated to the second counsel for respondent that petitioners are entitled to the entire amount of each of those claimed losses. He continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

In addition to advocating to the second counsel for respondent that petitioners' basis in the Elm Court property was significantly less than the amount that they had received when they disposed of that property and that therefore petitioners had incurred a loss for tax purposes in the amount that they claimed in their second amended 2009 return, Mr. Niehus also advocated to that counsel at a

[*81] meeting in the summer of 2013 (i.e., the summer 2013 meeting), as he had advocated when he was dealing with the Appeals officer and the first counsel for respondent, that the claimed Elm Court loss was an ordinary loss, not a capital loss. Mr. Niehus knew, and advised petitioners, that, given their tax situation for the taxable years 2007, 2008, and 2009 (and their anticipated tax situation thereafter),[38] a capital loss for taxable year 2009 with respect to the Elm Court property would have been of virtually no tax benefit to them for the taxable year 2009 or for any other taxable year. Mr. Niehus also advised petitioners that, even if the IRS were willing to concede the entire amount (i.e., $435,751) of the claimed Elm Court loss as a capital loss, not an ordinary loss, any such concession, given petitioners' tax situation, would have been of virtually no tax benefit to them for the taxable year 2009 or for any other taxable year. That was because, Mr. Niehus told petitioners, under the relevant tax law the maximum amount of capital loss (in excess of capital gain) that is allowable each year to an individual is $3,000. He also told them that, in contrast to that capital loss tax treatment, under the relevant tax law there is no similar limitation on the use of an ordinary loss to reduce

---

[38]Petitioners did not have capital gain for any of the years at issue (and did not anticipate having any substantial capital gain for subsequent taxable years) that would have been reduced by the claimed Elm Court loss if that loss had been treated as a capital loss.

[*82] ordinary income.  Mr. Niehus further informed petitioners that consequently a concession by the IRS of an ordinary loss with respect to the Elm Court property in an amount that was significantly smaller than a capital loss for the entire amount of the loss that petitioners claimed in their second amended return with respect to that property would be significantly more beneficial for tax purposes to petitioners.  In this regard, petitioners conceded, as reflected in the stipulations of settled issues, many IRS determinations that would have resulted in a substantial increase in their ordinary income for each of the taxable years 2007, 2008, and 2009.  Mr. Niehus advised petitioners that if the IRS were to agree to allow an ordinary loss for taxable year 2009 with respect to the Elm Court property, even in an amount that was significantly less that the entire amount of the claimed Elm Court loss, any such ordinary loss, in contrast to treating the claimed Elm Court loss as a capital loss, would have benefited petitioners dollar for dollar in reducing the additional amount of ordinary income for each of those years that they would have as a result of those concessions.

At the conclusion of the discussions at the summer 2013 meeting among Mr. Niehus, petitioners, and the second counsel for respondent, the second counsel for respondent was very skeptical of petitioners' position that their claimed Elm Court loss was an ordinary loss, not a capital loss.  In fact, that counsel offered to

[*83] resolve the claimed Elm Court loss issue by allowing petitioners a capital loss with respect to the Elm Court property for the taxable year 2009.[39]  Mr. Niehus rejected that offer on behalf of petitioners, and Mr. Niehus proceeded to advocate again to the second counsel for respondent why the full amount of the claimed Elm Court loss should be allowed as an ordinary loss for petitioners' taxable year 2009.  He also continued to advise petitioners that he believed that they had a better than 50-50 chance of prevailing in court on the claimed Elm Court loss.

The second counsel for respondent was skeptical not only of the ordinary nature of the claimed Elm Court loss but also of the basis that petitioners were claiming with respect to the Elm Court property and that they used in determining the amount of the loss that they were claiming with respect to that property.  In an effort to address the concerns of the second counsel for respondent regarding the basis of petitioners in the Elm Court property, on August 22, 2013, Mr. Niehus sent to that counsel a letter and certain documents that related to the claimed Elm Court loss.  In that letter, Mr. Niehus stated in pertinent part:

---

[39]The record does not establish the amount of capital loss that the second counsel for respondent offered to allow petitioners in an effort to resolve the claimed Elm Court loss.

**[\*84]** This letter is being sent to you to follow-up on the pending issues regarding the Bigg/Shamrock case for [sic] which you are handling. Attached are expense ledgers pertaining to the property at 1249 Elm Court in Glenview, Illinois. These ledgers and receipts [that] substantiate $140K of the $168K of expenses regarding the above property. The remaining $28K of expenses was expensed in other months and this documentation is forthcoming and will be mailed to you under separate cover. However, this documentation solidifies the majority of the $168K in expenses.

We will also be forwarding you more documentation on these expenses that is forthcoming from the bank the [sic] further substantiates these expenditures.

If possible, we would like to meet with you as soon as possible to reconcile this pending real estate issue.

In a continuing effort to address the concerns of the second counsel for respondent regarding the basis of petitioners in the Elm Court property, by fax dated September 23, 2013, Mr. Niehus sent to that counsel the September 20, 2013 letter and certain documents that related to the claimed Elm Court loss. In that letter, Mr. Niehus stated in pertinent part:

This letter is being sent to you to follow-up on the pending issues regarding the Bigg/Shamrock case for [sic] which you are handling. As my client has been attempting to gather all needed information you requested, there has been material changes in the proper calculation of the 1249 Elm [Court] tax basis.

**[*85]**     Thus the correct basis is as follows:

1.)     Land does not change $468,500.

2.)     The original loan authorized was $781,221, per closing state-
         ment, Item "A". The Taxpayer wrote 3 checks $45,000,
         $40,000 and $30,000 totaling $115,000. Per attachment "C"
         final. The total amount invested is $897,221. Per Bank state-
         ment total is $895,779 with the difference being accrued inter-
         est.

3.)     The taxpayer's out of pocket was $168,000 but must be re-
         duced by the $115,000 of checks written to Bank--thus total
         * * * out of pocket paid by taxpayer is $53,000.

4.)     Lastly, per the closing statement, "B" $200,000 was paid as a
         final draw to pay various subcontractors. These payments
         originated from the seller's funds at closing, and were the last
         payments to complete the project.

         In summary, total Basis is calculated as follows:

| | |
|---|---|
| Land | $468,500 |
| Bank | $895,000 |
| Taxpayer Funds | $ 53,000 |
| Closing | <u>$200,000</u> |
| **Total** | **$1,616,500** |

In his September 20, 2013 letter, Mr. Niehus further stated in pertinent part:

"I do know this may be confusing, therefore, the taxpayer and I can meet ASAP in

[*86] order to more easily track the flow of cash investments and **basis**. Also, enclosed is a history of Mr. Shamrock's real estate development projects over the last 20 plus years."

As is apparent from Mr. Niehus' September 20, 2013 letter, as late as the date of that letter, which was more than two years after petitioners retained Mr. Niehus, petitioners were sending documents to him that they had not previously given him (i.e., new documents) or the IRS, some of which contradicted certain documents that they had previously given him (i.e., old documents) and the IRS. They wanted and expected Mr. Niehus to present those new documents that contradicted certain old documents (i.e., the new and contradictory documents) to the second counsel for respondent and to continue to advance and advocate their position that they were entitled to ordinary loss treatment for the entire amount of the claimed Elm Court loss. Mr. Niehus did what petitioners wanted and expected and continued to advocate acceptance by the IRS of petitioners' position with respect to that loss. Petitioners and Mr. Niehus knew, or should have known, that presenting those new and contradictory documents to the second counsel for respondent would likely cause that counsel and other representatives of the IRS involved in this case to continue to be suspicious of, and to have trust and credibility issues with, petitioners and their claims, as certain IRS representatives previ-

[*87] ously had because of events that had occurred during the IRS examination and before they retained Mr. Niehus to represent them with respect to the IRS examination.

Approximately 10 days before the October 28, 2013 Chicago trial session commenced, Mr. Niehus, on behalf of petitioners, and the second counsel for respondent resumed their settlement discussions with respect to, inter alia, the claimed Elm Court loss, which had been interrupted by a shutdown of the Federal Government from October 1 to 17, 2013. Shortly before the October 28, 2013 Chicago trial session commenced, the second counsel for respondent informed Mr. Niehus and petitioners that he would be willing to settle that issue as follows: Petitioners (1) would be entitled for taxable year 2009 to an ordinary loss of $217,728 with respect to the claimed Elm Court loss, or approximately one-half of the total claimed Elm Court loss of $435,751 that they had reported as an ordinary loss deduction in petitioners' second amended 2009 return and (2) would concede the balance (i.e., $218,023) of that claimed loss.[40]

_____

[40]As part of the settlement of the two major issues that were not resolved by the February 28, 2013 stipulation of settled issues, the second counsel for respondent sought petitioners' concession of the claimed 2008 partnership loss. Petitioners were willing to concede that loss in full because they were unable to provide documentation to the IRS establishing that Mr. Shamrock had incurred that loss as they and Mr. Niehus on their behalf had previously contended before

(continued...)

[*88] Mr. Niehus continued his competent, valuable, diligent, and effective representation of petitioners when he recommended to them that they accept the basis on which the second counsel for respondent had offered to resolve the claimed Elm Court loss. Because of Mr. Niehus' detailed explanation to petitioners as to why he recommended that they accept the basis of settling the claimed Elm Court loss that the second counsel for respondent had proposed, Mr. Shamrock and Ms. Bigg understood very well the consequences of their accepting that proposed basis of settlement as well as the consequences of rejecting it. See Lovenguth v. Commissioner, 2007 WL 922231, at *5.

Mr. Niehus based his recommendation to petitioners that they accept the basis on which the second counsel for respondent had offered to resolve the claimed Elm Court loss on a number of factors that he discussed with them. He first advised petitioners that he believed that the second counsel for respondent would be unwilling to offer to concede an amount of the claimed Elm Court loss of $435,751 that was larger than the $217,728 that he had indicated he was willing to concede.

---

[40](...continued)
the IRS. See supra note 20.

[*89] Mr. Niehus next explained to petitioners that, because the second counsel for respondent was adamant about not allowing petitioners a larger amount of the claimed Elm Court loss, the only two avenues available to them would be to accept the settlement that that counsel had proposed or to litigate that loss.[41] Mr. Niehus further explained to petitioners that if they decided to litigate the claimed Elm Court loss, they would be litigating the entire amount of that loss, not just the portion of that loss that the second counsel for respondent was unwilling to allow.

Mr. Niehus also described for petitioners what he believed to be other so-called hazards of litigating the claimed Elm Court loss, which he told them they should take into account in deciding whether to litigate the claimed Elm Court loss. Mr. Niehus informed petitioners that the principal hazard of litigating that issue was that the Court might reject their position that they are entitled to that loss

---

[41]At the first meeting that Mr. Niehus had with Mr. Shamrock and Ms. Bigg, he made it clear to them that although he was willing to represent them in attempting to resolve with the IRS all of the examination issues for taxable years 2007, 2008, and 2009, he was unwilling to represent them in the event that they and the IRS were unable to reach a mutually satisfactory resolution of all of those examination issues and they wanted to litigate the unresolved issues. That was because, as he told Mr. Shamrock and Ms. Bigg at their first meeting, he was not a trial lawyer. However, Mr. Niehus had indicated to petitioners at the initial meeting with them that in the event that they wanted a trial with respect to any unresolved examination issues, he would recommend a trial lawyer to represent them. During Mr. Niehus' representation of petitioners, they never asked him to recommend a trial lawyer to them.

[*90] for the taxable year 2009--a result that would provide them no tax benefit from that claimed loss and that obviously would be worse than the result if they had accepted the settlement offer of the second counsel for respondent. Another litigating hazard about which Mr. Niehus advised petitioners was that the Court might hold that although petitioners had incurred a loss from the disposition of the Elm Court property, that loss was a capital loss, and not an ordinary loss--a result that would provide them virtually no tax benefit[42] from that claimed loss and that obviously would be worse than the result if they had accepted the settlement offer of the second counsel for respondent. Another hazard of litigation was that the Court might find that petitioners had failed to establish their tax basis in the Elm Court property and thus had failed to establish that there was any loss on the disposition of that property.

Mr. Niehus also informed petitioners that another factor that they should consider in deciding whether to accept the settlement with respect to the claimed Elm Court loss that the second counsel for respondent had proposed or to reject it and to litigate that issue was the cost of litigation. Mr. Niehus told petitioners that it would be expensive to litigate the claimed Elm Court loss.

---

[42]As indicated above, Mr. Niehus had previously advised petitioners that treating the claimed Elm Court loss as a capital loss would provide them with only a $3,000 annual tax benefit over a period of many years. See supra note 17.

[*91] After Mr. Niehus explained to petitioners why he was recommending that they accept the settlement offer of the second counsel for respondent with respect to the claimed Elm Court loss, Ms. Bigg told him and Mr. Shamrock that she wanted to accept that offer and thereby put the case pending in the Court behind her.

Before signing the October 28, 2013 supplemental stipulation of settled issues, petitioners wanted to know how much they would be required to pay to the IRS with respect to taxable years 2007, 2008, and 2009 as a result of the agreements that they had reached with respondent and that were set forth in that stipulation and in the February 28, 2013 stipulation of settled issues. In this connection, at the calendar call for the Court's October 28, 2013 Chicago trial session, the following exchange, inter alia, took place between Mr. Niehus and the Court:

> Mr. Niehus: [T]here is [sic] about 50 issues that were originally under audit, 48 were agreed upon. The last two are large and material in nature, and before the Petitioners wanted to know, they wanted to know what the net liability would be, because the last issue took about a year to settle or come to an agreement to. And they'd like to know what the bottom line is <u>before they would settle</u>. We understand in 30 to 60 days that final number will be then reviewed, sent to us, we'd like to review it and then sign off and the matter will be settled. [Emphasis added.]

[*92] The Court:       Then you don't have a settlement and we'll go to trial.

Mr. Niehus:       I'd rather not go because all we're doing is looking to review a computation.

 *          *          *          *          *          *          *

The Court:       * * * if you sign the supplement[al] * * * stipulat[ion of settled] issues and your clients don't like the bottom line number.

Mr. Niehus:       Oh, no, they just want to know what it is.

The Court:       Okay, they'll know what it is before you submit the decision documents reflect[ing] * * * the supplemental stipulation of settled issues.

Mr. Niehus:       Okay, then that's what we'll need.

The Court:       * * * I thought you were saying you weren't going to sign the supplemental stipulation of settled issues until you knew and however long it takes you to do the computations [of] what the [tax] number is.

Mr. Niehus:       Well, we prefer to do that.  If that is not possible then we would sign it today.

The Court:       That's not possible.

Mr. Niehus:       Then we'll sign it today.

The Court:       Okay, do you have it with you?

Mr. Shelton:       We do.

**[*93]** The Court: Let's sign it right now, but I want your entry of appearance first.

Mr. Shelton: Judge, the [supplemental] stipulation[ of settled issues is] * * * actually made out for Petitioner's [sic] pro se signatures.  If we could have, or if the Court could recall us at the end of the call we could probably get these signed.

Mr. Niehus: They're right here to sign it now.

The Court: Oh, so you're--

Mr. Niehus: My client, the client, the taxpayers are here right now.

The Court: But you're going to enter an appearance, too?

Mr. Niehus: Yes.

The Court: Your signature would have to be on it, too.  Okay, why don't I recall this case at the end of the calendar call.  Will that give you enough time?

Mr. Shelton: It will give us enough time to get Petitioners' signature, if not to reprint new one for Petitioners' counsel's signature, Your Honor.

The Court: He can just add his signature at the bottom of the page, put his name, put his, but I want it, I don't want it without your entry of appearance.

Mr. Niehus: Yes.

The Court: Okay?  And if you're not ready at the end of the calendar call then we'll call it later today.

**[\*94]** On October 28, 2013, petitioners signed the October 28, 2013 supplemental stipulation of settled issues, as did Mr. Niehus and the second counsel for respondent, and the parties filed it with the Court.

Thereafter, respondent had tax computations undertaken that showed the total liability of Mr. Shamrock for taxable year 2007 and of Mr. Shamrock and Ms. Bigg for each of the taxable years 2008 and 2009 pursuant to the stipulations of settled issues that petitioners and a counsel for respondent had signed and filed with the Court. The second counsel for respondent had revised tax computations prepared to correct a computational issue that Mr. Niehus, because of his competent, valuable, diligent, and effective representation of petitioners, had found and pointed out to that counsel.

To summarize the Court's findings that make apparent the factual flaws in petitioners' per injustice argument, Mr. Shamrock refused to sign the decision documents because (1) he was not pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue and (2) Mr. Drobny made an erroneous representation to him, and shortly thereafter to Ms. Bigg, that if Mr. Niehus had brought Gates v. Commissioner, 135 T.C. 1, to the attention of respondent's representatives, respondent would have conceded as a deductible ordinary loss under the entire claimed Elm Court loss, not just 50

[*95] percent of that claimed loss as reflected in paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues. If Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would have signed the decision documents that respondent had prepared. If Mr. Shamrock had been pleased with what the revised tax computations showed he and Ms. Bigg were required to pay to the IRS for the years at issue, he would not have consulted and retained Mr. Drobny to represent petitioners in this case. If Mr. Shamrock had not consulted and retained Mr. Drobny, Mr. Drobny would not have made representations to him, and shortly thereafter to Ms. Bigg, about the Gates Opinion, which are erroneous.

Mr. Niehus' representation of petitioners with respect to taxable years 2007, 2008, and 2009, including when they signed the February 28, 2013 stipulation of settled issues and the October 28, 2013 supplemental stipulation of settled issues that included paragraph 22, was competent, valuable, diligent, and effective, and petitioners were well represented by him. There were considerable negotiations and bargaining by Mr. Niehus on petitioners' behalf in an attempt to settle all of the examination issues, in particular the claimed Elm Court loss. Because of Mr. Niehus' detailed explanation to petitioners of the so-called pros and cons of accepting or rejecting the basis of settling the claimed Elm Court loss that the

[*96] second counsel for respondent had proposed, Mr. Shamrock and Ms. Bigg understood very well the consequences of their accepting that proposed basis of settlement as well as the consequences of rejecting it.

Based upon the Court's examination of the entire record before the Court, certain caselaw, and certain rules of the Illinois Supreme Court, the Court rejects petitioners' per se injustice argument.

Before addressing the second issue of whether to grant respondent's motion to impose sanctions under section 6673(a)(2) on Mr. Drobny (respondent's motion), we address one final matter regarding the first issue of whether the Court should set aside paragraph 22. At times throughout the proceedings in this Court, petitioners have suggested that that paragraph should be set aside because there was "fraud upon the court". In Drobny v. Commissioner, 113 F.3d 670, 677-679 (7th Cir. 1997), aff'g T.C. Memo. 1995-209, the Court of Appeals reaffirmed in all material respects the principles that it had articulated in its earlier decision in Kenner v. Commissioner, 387 F.2d 689, 691 (7th Cir. 1968), which addressed the concept "fraud upon the court". Those principles include the following.

The concept "fraud upon the court" does not encompass "all deceptive or improper conduct". Drobny v. Commissioner, 113 F.3d at 677 (quoting Kenner v. Commissioner, 387 F.2d at 691). That concept "embrace[s] only that species of

[*97] fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Id. at 677-678 (quoting Kenner v. Commissioner, 387 F.2d at 691). The party "who seeks to impeach an order or decree of a court" has a "heavy burden" to "come forward with 'specific facts which will pretty plainly impugn the official record.'" Id. at 677 (quoting Kenner v. Commissioner, 387 F.2d at 691). That party must show "not only that" conduct was engaged in "that was intended to mislead the court, but--of paramount importance--that the actual conduct affected the outcome of the[ ] case." Id. at 678; see Kenner v. Commissioner, 387 F.2d at 692.

On the record before the Court, the Court finds that Mr. Niehus' failure to inform petitioners that after 2009 he no longer was authorized to practice law in Illinois because he did not pay certain required dues to the Illinois State bar and did not comply with certain CLE requirements[43] did not negatively affect the

_____

[43]The Court has found that in Part II, Declaration of Representative, of Form 2848, which Mr. Niehus signed, he represented that he was a member in good standing of the Illinois State bar. We have also found that although Mr. Niehus did not intend to misstate his status with the Illinois State bar or to deceive the IRS or petitioners when he signed part II of Form 2848, his representation in that part that he was a member in good standing of the Illinois State bar was not accurate.

(continued...)

**[*98]** outcome of petitioners' case.  On that record, the Court finds that there was no fraud upon the Court.

Based upon the Court's examination of the entire record before the Court, certain caselaw, certain rules of the Illinois Supreme Court, and Rule 91(e), the Court finds that justice does not require that the Court set aside under Rule 91(e) paragraph 22 of the October 28, 2013 supplemental stipulation of settled issues.

The Court considers now respondent's motion.  Section 6673(a)(2) authorizes the Court to require any person admitted to practice before the Court who has multiplied the proceedings in any case unreasonably and vexatiously to pay personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

The Court believes that Mr. Drobny multiplied the proceedings on remand of this case unreasonably and vexatiously.  Nonetheless, the Court will not

---

[43](...continued)
We have further found that Mr. Niehus simply did not have in mind, and may not even have been aware, when he signed part II of Form 2848 that after 2009 he no longer was authorized to practice law in the State of Illinois on account of his failure to comply with certain Illinois State bar attorney status requirements.  That was because of the intense pressures and stresses to which he had been subjected as a result of the critical illness of his spouse and her death from that illness as well as his dealing for over three years after her death with resolving the problems associated with a franchise business that his spouse and he had operated.

**[\*99]** sanction him at this time under section 6673(a)(2).  The Court cautions Mr. Drobny that he may be subject to such a sanction if in the future he multiplies the proceedings in any case before this Court unreasonably and vexatiously.  See Nis Family Tr. v. Commissioner, 115 T.C. 523, 547-553 (2000).

The Court has considered all of the contentions and arguments of petitioners that are not discussed herein, and the Court finds them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

An appropriate order and decision will be entered.